STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. JOSEPH LaFERA, Sr., WILBUR W. BLAUVELT, RICHARD N. DINALLO, ANTHONY P. MIELE AND PHILIP R. SALVATORE, DEFENDANTS-RESPONDENTS.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOSEPH LaFERA, Sr., WILBUR W. BLAUVELT, RICHARD N. DINALLO, ANTHONY P. MIELE AND PHILIP R. SALVATORE, DEFENDANTS-APPELLANTS.

Argued January 6, 7, 1964—Decided April 20, 1964.

See also 35 *N. J.* 75, 171 *A.* 2d 311.

*Mr. John J. Bergin,* Assistant Attorney General, argued the causes for plaintiff-appellant and respondent (*Mr. Arthur W. Brinkmann, Mr. John W. Hayden, Jr.,* and *Mr. John Waldron,* Deputy Attorneys General, on the brief; *Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

*Mr. William A. Wachenfeld* argued the causes for defendant-respondent and appellant LaFera.

*Mr. John J. Breslin, Jr.,* argued the cause for defendant-appellant Blauvelt (*Messrs. Breslin & Breslin,* attorneys).

*Mr. Walter D. Van Riper* argued the cause for defendant-appellant Dinallo (*Messrs. Van Riper & Belmont,* attorneys).

*Mr. John W. McGeehan, Jr.,* argued the causes for defendant-respondent and appellant Miele.

*Mr. Albert G. Besser* argued the causes for defendant-respondent and appellant Salvatore.

The opinion of the court was delivered by
WEINTRAUB, C. J.   Defendants were convicted of a conspiracy to rig bids on a public project. They appealed. Before

the appeal was argued, defendants obtained a remand to permit them to apply to the trial court for a new trial on the ground that a juror was biased and prejudged the case. After a hearing, the trial court ordered a new trial. The State was granted leave to appeal. We certified both that appeal and the appeals from the judgments of conviction before argument in the Appellate Division.

## . I.

We think it unnecessary to decide the appeal from the order for a new trial since we are satisfied defendants should prevail upon their main appeal from the judgments of conviction for reasons given later in this opinion. Nonetheless, we feel we should express some views upon questions related to the motion for a new trial.

## A.

Defendants say the order granting a new trial is not reviewable. They cite *State v. Haines*, 20 *N. J.* 438, 447 (1956), where it was noted in an incidental discussion that the State may not appeal from a trial court's order for a new trial. In that connection the Court referred to the *Report of the Committee on Appeals by the State in Criminal Cases*, March 1, 1955, which recommended that an appeal be authorized, saying (at *p.* 9):

"The most frequent grounds for the granting of a new trial or arresting judgment by the trial court are either (a) that the verdict was against the weight of the evidence; or (b) that serious legal error affected the result. Common experience has shown that if the new trial be granted on the first ground the natural consequence is the subsequent voluntary dismissal of the indictment by the prosecutor. No injustice would come to a defendant if the State, in addition to considering the practicality of a new trial, should have the alternative of appealing the action of the trial court. * * *"

Defendants stress that we did not amend our rules to implement that recommendation, and they add that the report of

our Committee on Criminal Procedure, May 11, 1961, declined to renew the 1955 proposal, saying (at *p.* 25):

"The Committee does not renew the recommendation made in 1955 that the State be allowed to appeal from an order of the trial court granting a new trial. In the majority of instances such orders are based upon an evaluation of the evidence which is peculiarly for the trial court's determination. * * *"

On the other hand, the State points to *State v. Levitt*, 36 *N. J.* 266 (1961), and *State v. Rosania*, 33 *N. J.* 267 (1960), in both of which the State obtained a review of an order of the trial court vacating a judgment of conviction on a posttrial charge that a juror was biased. In neither case, however, was the issue of appealability raised, and hence we are now called upon for the first time to decide whether such an order may be reviewed notwithstanding the general proposition that the State may not appeal from the granting of a motion for a new trial.

The answer is found in the history of the subject. Although the State could not appeal from an order granting a conventional motion for a new trial, it could appeal from a judgment in a *habeas corpus* proceeding. The reason was that *habeas corpus* was regarded as a separate civil proceeding rather than a step in the criminal cause and hence the State could seek a review as in any other civil matter. *State v. Daniels*, 38 *N. J.* 242, 246 (1962); *State v. Court of Common Pleas of the County of Mercer*, 1 *N. J.* 14 (1948); *State v. Rivers*, 16 *N. J. Super.* 159 (*App. Div.* 1951).

This distinction between a motion for a new trial and a proceeding in *habeas corpus* still exists, although somewhat obscured by recent events. The reach of *habeas corpus* has been expanded, sundry denials of fundamental fairness being deemed to be "jurisdictional" and hence remediable under that ancient writ. See *State v. Cynkowski*, 10 *N. J.* 571, 576 (1952). At the same time there has developed an impatience with procedural niceties, so that if sufficient reason appears in the moving papers, the grievance is aired whether the

application is called a motion for a new trial or a petition for a writ of *habeas corpus*. But in thus cutting through procedural knots at the trial level, there is no intent to deprive the State of its existing right of review, or to suggest that the question of appealability shall be determined by the vehicle used to bring the issue into court. Rather the State's right to appeal depends upon the nature of the issue and its relation to the preexisting right to review.

We recently adopted *R. R.* 3:10A to prescribe a single all-embracing procedure for post-conviction review and in doing so we overlooked the question as to the scope of the State's right of appeal. We provided for the use of a petition, and directed it to be filed in the original criminal cause, *R. R.* 3:10A–1 and 7, in part to the end that the entire history of a defendant's efforts to undo his conviction will be immediately known. *R. R.* 3:10A–9 provides that the State may file an answer or move to dismiss. The trial court's disposition of the petition is called a "judgment," and *R. R.* 3:10A–12 says "Such judgment shall constitute a final judgment in a criminal cause." In so providing we were thinking of how a defendant's appeal should be prosecuted, and to that end the judgment was equated with a final judgment. But the question whether the State could appeal did not occur to us, and thus no effort was made to delineate or deal with the cases in which that right existed.

Obviously the State's right to appeal should not hinge upon whether the proceeding is given one tag rather than another. For example, in *State v. Grillo*, 16 *N. J.* 103 (1954), a companion case to *Rosania, supra* (33 *N. J.* 267), Grillo employed a motion for a new trial to assert his claim that he was denied due process because of the alleged bias of a juror. He was denied relief on the merits. Later Grillo advanced the same charge in the federal courts in a proceeding for a writ of *habeas corpus*. He lost at the trial level but prevailed on appeal. *United States v. McCorkle*, 248 *F.* 2d 1 (3 *Cir.* 1957), *cert.* denied 355 *U. S.* 873, 78 *S. Ct.* 121, 2 *L. Ed.* 2d 77 (1957). There seems to be no doubt that, had Grillo suc-

ceeded in the United States District Court, the State could have appealed. See *Knewel v. Egan*, 268 *U. S.* 442, 45 *S. Ct.* 522, 69 *L. Ed.* 1036 (1925). It would hardly make sense to have the State's right to appellate review in such cases depend upon the procedural route which is employed to raise an issue rather than upon the nature and significance of that issue.

■ It seems to us that the correct rule is this: the State may not appeal from a trial court's order for a new trial based upon the record of the trial itself (including newly discovered evidence which must be weighed in the light of the existing record). On the other hand, if the attack is collateral in nature and involves issues not litigated in the main case, the order should be reviewable on the State's behalf. The distinction of course is the one discussed above, between the traditional motion for a new trial and a proceeding for relief based upon lack of jurisdiction or upon fundamental unfairness remediable under the expanded view of *habeas corpus*.

This distinction appears to prevail in the federal scene. In *United States v. Williamson*, 255 *F.* 2d 512, 515 (5 *Cir.* 1958), *cert.* denied 358 *U. S.* 941, 79 *S. Ct.* 348, 3 *L. Ed.* 2d 349 (1959), it was held that the Government may appeal from an order under 28 *U. S. C. A.* § 2255 which authorizes a "motion" for relief upon such collateral grounds, the court pointing out that the proceeding under that section "is, like *habeas corpus* which it was enacted to simplify and largely supplant, a civil matter rather than criminal although it necessarily deals with criminal convictions." To the same effect is *United States v. Kelly*, 269 *F.* 2d 448, 451 (10 *Cir.* 1959).

■ Here defendants assailed the judgment upon a basis beyond the record of the trial itself. They alleged they were denied due process of law because a juror was biased, a charge within the enlarged view of *habeas corpus*. The order vacating the judgments of conviction was therefore appealable.

■ There is the further question as to whether an order granting a new trial should be treated as interlocutory or final. Under our practice, the significant difference is that

leave to appeal must be had if the order is interlocutory and leave must be sought within a shorter period than is provided for an appeal as of right from a final judgment. In this connection we should discuss *State v. Daniels, supra* (38 *N. J.* 242). There defendant was sentenced upon a plea of *non vult* to an indictment for murder. More than a year later he sought to be relieved of his plea upon what he labeled a petition for a writ of *habeas corpus,* which however was molded into a motion in the original cause to withdraw his plea under *R. R.* 3:7–10(a). He prevailed and the State appealed. Defendant did not question the State's right to seek a review but contended the order was interlocutory and hence leave to appeal should have been sought under *R. R.* 1:2–4(c). The State countered that the proceeding should be treated as one in *habeas corpus,* as defendant had initially called it, and hence the order should be deemed to be a final judgment in a civil matter, appealable by the State as of right. We rejected that view but nonetheless granted the State leave to appeal from the order as an interlocutory one.

Analytically an order vacating the sentence and plea could be final or interlocutory depending upon the basis for the relief, *i. e.,* whether (1) on a claim that the defendant was denied due process by the misconduct of others or (2) upon grounds addressed solely to the discretion of the court. The expanded writ of *habeas corpus* could include the first type of ground and an order based upon it would be final as in a *habeas corpus* proceeding. But if the application is addressed solely to the discretion of the court, an order granting relief would be interlocutory as that concept is usually understood. Nothing, however, is gained by maintaining a distinction of that kind. The truth is that whenever a judgment in *habeas corpus* leads to a new trial, it is interlocutory in its practical effect, being then but an intermediate step which serves to renew the criminal controversy. This being, so, it is appropriate to say all trial court orders leading to a new trial, if they are reviewable, shall be deemed interlocutory for the purpose of appellate procedure. Not only will pro-

cedural quarrels be avoided but also the ultimate disposition of the criminal charge will be expedited by limiting appeals to situations in which an appellate court first finds sufficient reason for review. We add, not to support this approach but rather as an historical coincidence, that under our former judicial system, the State could review a judgment in *habeas corpus* by *certiorari,* the allowance of which was discretionary. See *State v. Court of Common Pleas of the County of Mercer, supra* (1 *N. J.* 14).

### B.

The defense launched a post-conviction investigation of the jury without leave of court. The State charges a violation of *R. R.* 1 :25A and contends the product of that investigation should be suppressed as a necessary sanction to discourage such conduct. *R. R.* 1 :25A provides:

"No attorney shall himself or through any investigator or other person acting for him interview, examine or question any juror with respect to the verdict or deliberations of the jury in any action except on leave of court granted upon good cause shown."

Defendants concede that upon nothing more than a sense of shock induced by the verdict of guilty, they engaged a private investigator named Klay to search for something to impeach the verdict. There is no doubt that the investigation was intended to probe the verdict and the deliberations of the jury. Klay was instructed by counsel not to interview a juror because of *R. R.* 1 :25A and none was interviewed, but Klay and as many as 12 or 13 others retained by him moved in and out of the affairs of the jurors, contacting relatives, friends, and associates under a multitude of guises, in the hope that something useful would emerge. This extraordinary investigation was conducted from January to December 1962, at a cost of $21,500. It bore no fruit until Klay learned that a juror, whom we shall call juror V., had left his place of employment, whereupon Klay, abandoning all pretenses, ques-

tioned the juror's former co-employees directly upon the topics of prejudice and prejudgment. Klay thereby obtained affidavits that juror V. strongly disliked people of Italian descent and had expressed his belief in the defendants' guilt before the trial started. It was upon those affidavits that the court undertook the inquiry.

██ Defendants say the quoted rule does not embrace what happened here since no juror was interviewed. Literally this is true, but we have no doubt the spirit of the rule was offended.

A jury deliberates in secrecy to encourage each juror to state his thoughts, good and bad, so that they may be talked out. "Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world." *Clark v. United States*, 289 *U. S.* 1, 13, 53 *S. Ct.* 465, 77 *L. Ed.* 993, 999 (1932). Some will recall the furor a few years ago when a jury's deliberations were secretly recorded, notwithstanding that the recording was made in a controlled study and the anonymity of the individual juror was completely assured. Ferguson, "Legal Research on Trial," 39 *J. Am. Jud. Soc'y* 78 (1955).

For the juror's individual protection, the law raises a privilege against disclosure of his communications during deliberations, a privilege which will yield only to some greater public need. 8 *Wigmore, Evidence (McNaughton rev. 1961)* § 2346, *p.* 678; *Clark v. United States, supra* (289 *U. S.* 1, 53 *S. Ct.* 465, 77 *L. Ed.* 993). It is true that no settled rule bars extrajudicial, post-trial disclosures by a juror of his own views even though in cases of public interest the trial judge not infrequently cautions against such disclosures. Yet one of twelve may not be able to disclose his own part without revealing something the other jurors are entitled to have protected. Moreover the public too has a stake in the promise of secrecy to insure free debate in cases to come. In these circumstances it is appropriate to protect all the jurors against efforts of others to browse among their thoughts in

search of something to invalidate their verdict. This *R. R.* 1:25A seeks to do.

We see no difference between an intrusion upon a juror personally of which the rule speaks literally and an intrusion into the juror's private relationships with others. If anything, an investigation conducted among others may be even more disturbing in that it tends to suggest to those who are interviewed that something is already known to be amiss. Hence it is unfair to jurors to permit a disappointed litigant to pick over their private associations in search of something to discredit them and their verdict. And it would be unfair to the .public too if jurors should understand that they cannot convict a man of means without risking an inquiry of that kind by paid investigators, with, to boot, the distortions an inquiry of that kind can produce.

But defendants say that due process of law is denied them if they may not probe to find out whether the verdict was vulnerable. They do not go so far as to say that a proceeding for discovery should lie in which the jurors, their families, friends, and associates may be produced by subpoena, but they do assert a right to search on their own. The State disputes the claim of right and adds with much force that if such a right exists, then every indigent defendant may demand the State furnish him the wherewithal to conduct the far-flung exploration here made.

It may appear odd to recognize a ground for the invalidation of a verdict while denying a litigant a chance to find out whether such an event perchance did occur. The fate of a defendant is thus made to depend upon sheer luck, that the wrongful event somehow comes to light. The weight of the criticism is appreciated, but when contending values clash in their demands, a balance must be struck, and the balance struck is not shown to be a poor one because in some unknowable cases there may be an injustice. Overall the instances of invalidating misbehavior are exceedingly few. And even within that limited group, a new trial may be a windfall for the defendant, since if the misconduct is capable of tainting

the verdict, the verdict will be set aside without inquiry into the actual impact of that misconduct upon the result. *State v. Kociolek*, 20 *N. J.* 92, 100 (1955); *State v. Levitt, supra* (36 *N. J.*, at *p.* 271). Thus there is but a small factor of possible hurt. Against this must be weighed the substantial interest of the public and of defendants as a group, in the full and free debate in the jury room. We think the approach of our rule is correct. In any event we see no constitutional difficulty.

We do not question the good faith of counsel, for we recognize that prior to our expression in this case another view of the reach of our rule could sincerely be held. In these circumstances we need not consider the State's proposal that the product of an offending investigation be suppressed as a suitable sanction.

## C.

After taking testimony the trial court rejected the charges advanced in the moving affidavits. Specifically the trial court found that juror V. spoke of all men in rough terms only because such was his manner and as well the fashion of his environs rather than because he harbored the prejudice his words might suggest in someone else. And as to the charge of prejudgment, the trial court discounted the testimony of the affiants after listening to them. However, in the course of the hearing the trial court examined other jurors and it was the disclosures by two of them, first made during the hearing, which led to the order for a new trial upon a finding that juror V. had reached "a final verdict of guilt, prior to the completion of the case, prior to the argument of counsel, and prior to the charge of the Court."

We are troubled by that thesis. A man inevitably reacts to what he hears as he hears it. He cannot avoid current impressions however much he wills to resist them. And although he may think those impressions are final, he cannot really know that they will endure. We may assume that many jurors begin the deliberations with strong convictions as to

how the case should go, and then yield them to persuasion in the jury room. We instruct jurors to refrain from premature discussion in the hope that they will enter upon their deliberations with a maximum capacity to consider the views of others, but we cannot say a juror is guilty of misconduct because he reaches a conclusion before ideally he should.

We have found no case in which a verdict was disturbed merely because a juror reached what proved to be his final view prior to the conclusion of the proof. The cases turn, not upon the proposition that a juror misbehaves if he reaches a premature conviction, but rather upon the circumstances in which he disclosed it. In cases in which a verdict was set aside, it appeared the juror informed third parties of the vote he would cast or otherwise revealed his conviction to a public view. *Ostrom v. Clapp*, 6 *Indian Terr.* 203, 90 *S. W.* 478 (*Ct. App.* 1905) ; *York v. Wyman*, 115 *Me.* 353, 98 *A.* 1024 (*Sup. Jud. Ct.* 1916) ; *Cooper v. Carr*, 161 *Mich.* 405, 126 *N. W.* 468 (*Sup. Ct.* 1910) ; *Norcross v. Willard*, 82 *Vt.* 185, 72 *A.* 820 (*Sup. Ct.* 1909) ; *cf. Schonhardt v. City of Pittsburgh*, 340 *Pa.* 155, 16 *A.* 2d 421 (*Sup. Ct.* 1940). We need not decide whether to subscribe to those cases. It probably is more difficult for a juror to change his position after stating it to some third person, and in any event such disclosures may tend to unsettle public confidence in the integrity of the verdict. But statements by a juror to a fellow juror do not present the same problem, and they have been held not to justify a new trial. *Blakeney v. Alabama Power Co.*, 222 *Ala.* 394, 133 *So.* 16 (*Sup. Ct.* 1931) ; *State v. Cook*, 52 *La. Ann.* 114, 26 *So.* 751 (*Sup. Ct.* 1899) ; *Kaul v. Brown*, 17 *R. I.* 14, 20 *A.* 10 (*Sup. Ct.* 1890) ; *cf. Bates v. Siebrand Bros. Circus & Carnival*, 71 *Idaho* 318, 231 *P. 2d* 747 (*Sup. Ct.* 1951).

It may well be that a motion for a mistrial can be granted in a court's discretion if it learns that a juror has expressed his view with apparent finality to fellow jurors or persists in premature discussions with them despite the court's instruction. But here we are concerned with a verdict already

rendered. The finding, as we read the court's opinion, that juror V. reached what proved to be his final view sometime during the trial and communicated that view to two of his fellow jurors, does not warrant a new trial.

With respect to the charge of anti-Italian bias, the trial court, as we said earlier, found the charge was not proved. Defendants urge that it was. We need not decide the question, but we feel obliged to comment upon the topic.

It is a vicious thing to convict a man out of bigotry, and hence, despite the strong policy against probing the motivations which inhere in a jury's verdict, 8 *Wigmore, Evidence* (*McNaughton rev.* 1961) § 2349, *p.* 681, we will hear a charge that a juror manifested such bias in his consideration of the case. *State v. Levitt, supra* (36 *N. J.* 266). The inquiry should not, however, be ordered without a sufficient preliminary showing that a juror carried his prejudice into the jury room. It is with respect to the required showing that we wish to say a word of caution.

It may be doubted that twelve jurors can be found who are free of all shades of bigotry in all of their worldly affairs. Biases vary widely in intensity and demand. Some are satisfied within purely social areas where they may assume the attitude of individual preferences. At the other pole is a sick, insatiable hate. Fortunately most of our citizens, whatever their bent in other things, would think it abhorrent that bigotry should prevail in the halls of justice. In recruiting jurors, we cannot expect to find men with the strength of a saint in all matters; we must be content with men minded to leave their prejudices on the courthouse steps and to decide a case on the merits alone. We must assume a juror is equal to his oath. If, however, a juror proves unequal to it, the conviction should be set aside, but as we pointed out in *Levitt*, the proof must show that the juror revealed that prejudice in the trial of the case. We want to stress that it would rarely, if ever, be enough to justify an inquiry to show that in some unrelated circumstances at some time before or after the trial a juror evidenced bias against the group to

which a defendant belongs. In this connection see annotation of the *Levitt* case in 91 *A. L. R.* 2d 1120 (1963), where the problem is discussed briefly, at *pp.* 1121 and 1126.

## II.

We turn to the defendants' appeal from the conviction. The pivotal issue is whether the evidence justified a finding of guilt. We think it did not.

The indictment, the sufficiency of which we heretofore sustained, *State v. LaFera*, 35 *N. J.* 75 (1961), alleged a conspiracy in violation of *N. J. S.* 2A:98–1 to prevent or obstruct the due administration of the competitive bidding statute, *R. S.* 58:14–22, by having two corporations submit bids which ostensibly were competitive but which in fact were predetermined by the agreement of defendants.

In 1950 the Passaic Valley Sewerage Commissioners found its sewerage disposal facilities were becoming antiquated and seriously inadequate. The Commissioners retained Bogert and Childs, consulting engineers, to study the facilities and to recommend a plan of rehabilitation. The engineers filed their report in 1954. As a result of their work, the Commissioners planned to let out five contracts. We are concerned with one of them, numbered 355.

In response to the Commissioners' advertisement, about 34 companies obtained specifications for the five contracts, but only three submitted bids for contract 355, as follows:

George M. Brewster & Son, Inc. (herein Brewster) for $4,998,450 and $5,024,450 on alternative bases;

Kuchar Brothers (herein Kuchar) for $5,092,550 and $5,116,650;

Terminal Construction Corp. (herein Terminal) for $5,125,180 and $5,130,180.

The bids charged to have been rigged were the bids of Brewster and Terminal. Kuchar was not indicted and no taint is alleged with respect to its bid, a circumstance of considerable importance as will later be developed.

The bids were opened on September 10, 1956. They were substantially higher than the estimate of Bogert and Childs, the Commissioners' consulting engineers. The question then was whether to make an award or to readvertise. Defendant Blauvelt, an officer of Brewster, met with the Commissioners and Bogert and Childs and disclosed his company's calculations. Bogert and Childs recommended that an award be made. The Commissioners made the award and a contract with Brewster was signed on October 3. Brewster filed the required bond and insurance certificates.

By agreement dated October 17 Brewster subcontracted part of the job to Kuchar for $2,200,000, and obtained the Commissioners' approval as required by the terms of the contract. At about the same time Brewster orally agreed with others for the performance of the contract through a joint venture, the parties and the percentage interests being:

| | |
|---|---|
| Brewster | 25% |
| Miele-Salvatore, itself a joint venture consisting of Joseph Miele Construction Co., Inc., a corporation, of which defendant Miele is an officer, and C. Salvatore & Sons, a partnership of which defendant Salvatore is managing partner | 50% |
| LaFera Contracting Co., Inc., a corporation of which defendant LaFera is an officer | 25% |

We note that neither the Miele company nor the Salvatore partnership nor the LaFera company had bid on the job. Of the three, only the LaFera company had taken out specifications, and according to LaFera, his company did not bid because the job and the risk were too great.

With respect to the creation of the joint venture, Blauvelt testified that Brewster sought to interest others in the job because it anticipated receiving an invitation to bid on a $20,000,000 federal project at Rome, New York. An invitation, dated October 15, was in fact received and Brewster did bid. Blauvelt initially approached Miele, who suggested that

both the Salvatore and LaFera concerns be asked to participate upon a four-way division, and that became the plan.

At the same time Blauvelt, for the joint venture, offered a subcontract to Terminal because of its special experience in the kind of work here involved. Terminal refused to be a subcontractor, but was willing to take a so-called management contract, upon a percentage of the profit, and that arrangement was agreed upon, Terminal to receive 30%.

The joint-venture agreement was reduced to writing on November 5. The management contract with Terminal was reduced to writing on November 7. Briefly summarized, the joint-venture agreement required the parties to share profit and loss in the percentage ratios we have already mentioned. Capital contributions were to be made on the same basis. The agreement also provided that the equipment requirements would be allocated in the same ratios among the venturers, and each venturer agreed to meet those calls at 75% of the standard rental rates. The record indicates that this division was maintained with respect to demands for equipment, including equipment held on a stand-by basis, and that the invoices were on the agreed 75% basis.

The Terminal management contract did not purport to involve Terminal as a co-venturer. Terminal agreed to contribute to working capital on a 30% basis, but, unlike the contributions of the joint venturers, Terminal's was described as a loan, and we gather that the several contributions of the parties were recorded in harmony with that distinction. Although Terminal's compensation depended upon profits, again, unlike the joint-venture agreement, the Terminal agreement did not require Terminal to share in losses. We note also that whereas the joint venturers were obligated to furnish equipment at 75% of the standard rate, Terminal was not, and its invoices for rental do not indicate anything less than a full charge.

We gather that Terminal eschewed the status of a subcontractor as too demeaning and hence insisted upon a "management" contract. It seems to us that there is no role halfway

between a joint venture and a subcontract and that the Terminal contract is technically a subcontract. At the same time, since the management contract calls for work which a general contractor would normally perform directly, the share of profits paid to Terminal should be included as part of the total profit of the general contractor for the purpose of judging whether the Brewster bid was inordinately high. Of this, more will be said later.

Thus, the several arrangements described above brought together the three companies that had bid the job. Kuchar held a subcontract for 40% of the total bid, as to which the record does not indicate the profit expectancy or experience. Terminal held 30% interest in the profit of the general contractor, while Brewster shared the balance and the overall risk of loss with three companies that had not bid at all. As we have noted, Kuchar, which, like Terminal and Brewster, was one of the three bidders, is not alleged to be a conspirator, while Miele-Salvatore and LaFera, who did not bid, are charged with complicity.

Since the charge is that bids were rigged, one would expect to find evidence of inordinate profit to support the charge. Conceivably such a conspiracy could be planned to obtain nothing more than a fair return, but that possibility is so remote that while the absence of the expectancy of unusual profits would not inescapably refute the conspiracy charge, it surely would speak strongly against it.

Upon this critical issue, the State's case is devoid of any inculpatory thrust. There is no evidence at all that the Brewster bid was out of line. As we have said, Blauvelt met with the Commissioners and the consulting engineers and laid out the details of Brewster's estimates, following which the Commissioners' consulting engineers recommended the award. It is significant that the actual experience on the job came very close to what was anticipated in the Brewster bid. The bid figures included 5% for general office overhead and 7½% for profit, for a total of 12½%. Using the same basis for calculation and treating Terminal's share of profits as

part of the general contractor's profit on the job (as stated above, we think it should be so treated for this purpose), the total gross profit was 11%, and if there is added an item of $48,100, paid in equal shares to the joint venturers for "expenses" and questioned by the State, the figure becomes 12.1%. We note in this connection that neither the venturers nor Terminal charged general office overhead against the job, so that the figures last mentioned are upon the same basis upon which the $12\frac{1}{2}\%$ figure (5% for general overhead and $7\frac{1}{2}\%$ for profit) was reached in preparing the bid.

There was no testimony that the profits were excessive. To the contrary there was considerable evidence that the profits were reasonable, and particularly so in the light of unusual difficulty and risk present in this work—much of the subject matter was under water and the sewerage disposal operation had to be continued without interruption. We note that the State suggests the profit would be a higher percentage if measured against only so much of the total job as was not subcontracted to Kuchar. As a matter of mathematics that is obvious, but we cannot find in the record any reason to approach the subject in that way. The general contractor of course is responsible for what he subcontracts. He must figure the work to be done, subcontract it, supervise it, coordinate it, and stand behind the subcontractor's performance. As we have already said, the work subcontracted to Kuchar was an expected subject for subcontracting. The breakdown of the Brewster bid shows subcontracts in approximately the amount of the Kuchar subcontract, and shows also that the 5% item for general office overhead and $7\frac{1}{2}\%$ for profit were applied to the cost of work to be subcontracted. Thus the 11% or 12.1% figure is comparable to the $12\frac{1}{2}\%$ shown in the original bid figures revealed to the Commissioners and the consulting engineers before the award. At any rate, whatever the mathematical approach, the fact remains that there is no expert testimony that the yield was at all unreasonable.

In this connection we note the State stresses that each of the joint venturers received the same total sum for equipment

furnished and for equipment held on a stand-by basis. We see nothing significant in that circumstance. Their contract contemplated that the equipment needs be prorated among them in proportion to their interests and that each be obligated to furnish the equipment at 75% of standard rates. We note too that the State's accountant testified there was no record maintained with respect to what equipment was on site. But these criticisms do not constitute proof that the costs were inflated and hence the actual profit greater than appeared. Indeed, we do not understand the State to contend that it had offered proof with that effect.

The State argues that an inference of guilt may be drawn from the speed with which defendants say they reached their agreements and from their alleged efforts to conceal their arrangements.

It will be recalled that about mid-October Brewster sought associates in this job in anticipation of the opportunity at Rome, New York. The joint-venture agreement was reached within a matter of days at the most. So far as Terminal is concerned, its situation is no different from Kuchar's, for both had bid the job, and if it is a suspicious circumstance that a subcontract was made so quickly, it is no less suspicious in the one case than in the other. As to the other three, none of whom had bid the job, an explanation is offered which cannot be said to be improbable. Brewster apparently is a substantial company, well regarded in the field. Miele, for the Miele-Salvatore venture, said he reviewed Brewster's calculations and depended upon that review plus his confidence in Brewster's skill in estimating. Salvatore relied upon the judgment of his associate Miele. LaFera testified that his company had initially examined the specifications and decided the job was too big, but that when Miele called him in furtherance of the call from Blauvelt to Miele, he told Miele to look into the matter and that "whatever he did was all right with me." These men all knew each other and the

capabilities of all of the organizations. We do not think their testimony is implausible, and surely not so much so as to justify an inference of corruption.

As to the charge of concealment, the State speaks in terms of what the Commissioners were told. This, we think, is a rather constricted approach, for when one speaks of conceal-ment as indicative of a consciousness of guilt, he thinks of a secrecy equal to the task of hiding the wrong from anyone's view. Surely there is no evidence here of an effort to cover up all traces. On the contrary, the joint-venture agreement was reduced to writing, and on the same day the parties to it executed and filed with the Clerk of Essex County a trade certificate stating that all of them are conducting a business under the name of "Geo. M. Brewster & Son, Inc.—Constructors." The insurance policies were amended accordingly.

On February 8, 1957 the insurance broker sent the policy to the Commissioners, and in that way the Commissioners learned of the joint venture and the parties to it. Counsel for the Commissioners wrote to Brewster for information, to which Brewster replied saying its full obligation to the Commissioners was not diminished by the joint venture; that it has engaged in multiple joint ventures and regularly has had the insurance coverage written to reflect it; and that if for any reason the Commissioners' approval is necessary, it requested that it be given, adding that "We feel, however, since our responsibility remains directly with the Passaic Valley Sewerage Commission, this may not be required." Counsel for the Commissioners called the attention of the Commissioners to the provision in its contract with Brewster that the contract may be annulled if the contractor "assigns, transfers, conveys, subleases or otherwise disposes of the contract or of his right, title or interest or to any part thereof." The Commissioners resolved to approve the arrangement "on the express condition that George M. Brewster & Son, Inc., shall remain liable to the Commissioners in all respects in accordance with its contract" and "that there shall be no obligation on the part of the Commissioners except to George M. Brew-

ster & Son, Inc., in accordance with the provisions of the said contract." Thus the Commissioners learned of the arrangement because the insurance coverage was handled in a regular way, and having learned of it, the Commissioners consented subject to the retention of the full obligation of Brewster.

It appears also that Miele, Salvatore and LaFera appeared on the job site with at least some regularity. They made no effort to conceal their interest.

As to Terminal, it appears the Commissioners themselves were unaware that that company was on the job, but it is clear that Bogert and Childs knew that the project was under the immediate management of a Terminal man and that Terminal equipment was being used. Perhaps Terminal's agreement should have been offered to the Commissioners for approval as a subcontract or as an assignment of interest. Whether it should, is not a critical question in a criminal case. What matters is whether the parties understood it had to be approved and hid it. There is nothing to indicate the joint venturers believed that approval was needed, and in any event there was no active concealment. The Terminal agreement was in writing, payments were made by check, and well known Terminal personnel and equipment were on site.

In summary, we find no basis upon which the conspiracy charged in the indictment can be fairly inferred. We must therefore find the State did not carry its burden to prove guilt beyond a reasonable doubt. It follows the convictions must be set aside. The remaining question is whether a new trial should be ordered, and in this connection we must consider evidence offered by the State but admitted by the trial court for a limited purpose only.

That evidence related to two prior joint ventures. The trial court admitted that proof solely to show the defendants knew each other. The testimony having been admitted for that limited purpose, the defendants properly offered no evidence to meet some other thrust, and of course we could

not properly give it any greater role on their appeal, except, as we have already said, upon the question whether the State should be permitted to bring defendants to trial again.

By virtue of the limited role accorded to that proof, the facts are quite skimpy. We gather that the first job was in Bayonne where Brewster and Miele-Salvatore bid as a joint venture while Terminal and LaFera also bid as a joint venture. We gather also that the unsuccessful combine challenged the award and that the litigation was settled by an agreement to complete the job together. The other joint venture was in Jersey City where all the parties submitted a single bid as a joint venture. In neither case did there appear the pattern here charged, *i. e.*, that the joint venturers concealed the joint venture and submitted two bids. Nonetheless the State urges that these two prior associations, both of which were concededly open and above board, serve to prove that the parties here conspired to rig the bidding.

The State conceded at oral argument that it could not prove that these companies regularly worked together and did not compete against each other. In short the State cannot prove a practice to do business as a joint venture so habitual that one could rationally infer they followed that habit in the present transaction. It may well be that proof of the prior joint ventures, despite the differences we noted in the paragraph above, could be a corroborative circumstance if there were other evidence of the conspiracy, but we cannot find that the two prior episodes are themselves probative of the crime here charged. This being so, that proof could not affect the result upon any view of it. Criminal liability must rest firmly upon evidence that bespeaks guilt. It is not enough that there could have been the illegal arrangement charged in the indictment. A man may not be condemned upon surmise, conjecture or suspicion.

The judgments of conviction are therefore reversed and the matter remanded with direction to enter judgments of acquittal.

*For reversal* — Chief Justice WEINTRAUB, and Justices PROCTOR, HALL, SCHETTINO and HANEMAN—5.

*For affirmance*—None.