**UNITED STATES of America**

**v.**

**Daniel J. DRISCOLL, Defendant.**

**66 Cr. 129.**

United States District Court
S. D. New York.

Nov. 1, 1967.

Supplemental Opinion Nov. 8, 1967.

Robert M. Morgenthau, U. S. Atty. for S. D. of New York, New York City, for the United States. Albert J. Gaynor, Executive Asst. U. S. Atty., John H. Doyle III, Asst. U. S. Atty., of counsel.

Frank G. Raichle, Buffalo, N. Y., for defendant. Thomas A. Bolan, Saxe, Bacon & Bolan, New York City, of counsel.

## OPINION

McLEAN, District Judge.

This is a motion by the government to restrain defendant and his attorneys and investigators from interviewing members of the jury which, on October 2, 1967, returned a verdict of guilty on each of three counts of an indictment which charged defendant with willful failure to file his federal income tax returns for the respective years 1960, 1961, and 1962 within the time required by law. I held a hearing and took testimony. On the basis of that testimony, I find the facts to be as follows.

A few days after the verdict, William J. Whelan, a private investigator, had telephone conversations with three jurors and a more extended face-to-face interview with a fourth. The substance of these conversations was as follows.

On October 4, Whelan telephoned juror no. 6, Newton Perlman, stated that he represented the law firm of Saxe, Bacon & Bolan (of which defendant is a member) and asked to see Perlman about the case. Perlman said that he was too busy to see Whelan at that time. A few days later Whelan telephoned Perlman again and inquired, "By the way, do you know that there was a hung jury on this?" This was a reference to defendant's first trial on this indictment, at which the jury disagreed. In response to Perlman's question as to whether a discussion of the case would be proper, Whelan said, "We usually do this. It is done in certain cases." Perlman made a tentative appointment to see Whelan but because of the temporary restraining order which I granted pending a determination of this motion, the interview never took place.

On October 4, Whelan telephoned juror no. 10, George J. Gurner. He said that he was from Saxe, Bacon & Bolan and asked for an interview. According to Gurner, Whelan said that his purpose was "to ask how I felt about the defense attorney's handling of the trial, why I rejected the insanity plea, did I know that there was a previous trial * * * in December 1966 at which time the trial ended with a hung jury, six for and six against, and what other aspects did I feel were hurtful to the defendant's case."

Whelan said that there was "nothing irregular" in this procedure. In his own testimony at the hearing, Whelan amplified this remark by stating that he said to Gurner:

"We do this usually in case of a new trial, or any material that we can gather for an appeal, or so. * * * Oh, that's what is done. You file papers for an appeal, and things like that."

Because of the temporary restraining order, Whelan had no further conversation with Gurner.

On October 3 or thereabouts, Whelan telephoned juror no. 2, Rosalie Carruba. She testified that "the gist of the whole conversation was where did they go wrong." Whelan assured her that a discussion of this subject was not irregular. He asked her to sign "a paper, a petition of some kind." She understood that this was a petition for a new trial. According to Whelan, he was referring to a petition for leniency in sentence. Mrs. Carruba declined to see Whelan. She declined to sign the petition.

On October 4, Whelan went to the place of business of juror no. 7, Vincent Michael Martin, and talked to Martin for approximately forty minutes. When Martin at first hesitated to discuss the case, Whelan told him that it was "legal" to do so.

Whelan asked Martin what the weak points of defendant's case had been and what evidence the jury considered damaging to defendant. Martin discussed with him at some length what the evidence was and how it had impressed the jury.

Whelan inquired why the jury found defendant guilty. He said, "Do you know you could have voted for an insanity plea?" In this connection, he asked why the jury had not been impressed with some of the testimony on this subject. Whelan testified that he said to Martin after Martin had answered this inquiry:

"I says, 'Well, that's where the mental block came in, see?' "

Whelan asked how the jury had proceeded in its discussion of the case and "whether we [the jury] polled ourselves." He told Martin that at the first trial the jury had divided six to six and that at that trial one juror "had stuck to his guns and said he wouldn't change his verdict." The context of this remark indicates that Whelan made it clear that this resolute juror had voted for acquittal. He wanted to know why the present jury voted the defendant guilty when the previous jury had disagreed. Whelan said that he had been "wary" of some of the present jurors when they were first selected, particularly the two women.

Whelan asked Martin to sign a petition for leniency. Martin was unwilling to commit himself to do so.

Subsequent to this interview, about a week before the hearing upon the present motion, Whelan telephoned Martin to say that Martin would probably be contacted by the U.S. Attorney's office. He asked Martin if he thought that Whelan had "harassed or intimidated" him, to which Martin replied, "No. It was just a conversation."

Whelan testified that he had been asked to interview the jurors by John F. Lang. Lang testified to the same effect. Lang is a lawyer who at one time was employed by Saxe, Bacon & Bolan and is now employed on the legal staff of one of that firm's principal clients. Lang was present during the trial and apparently assisted in the defense.

Lang testified that no one asked him to retain Whelan to interview the jurors but that he did so because:

"I have been working with Mr. Bolan on cases in this Federal Court and other cases where I have been an associate counsel with him over the past four or five years. And we have been doing that in every case that we have been on. And originally, when I was working for Mr. Bolan, he would tell me to contact Mr. Whelan, and have him interview jurors, and this happened in all the cases that I was on with him."

He went on to say that although Mr. Bolan did not ask him to retain Whelan in this particular instance, this was the "standard practice" of Saxe, Bacon & Bolan. He testified that he assumed Whelan's compensation would be paid by Saxe, Bacon & Bolan because Whelan was on a yearly retainer with that firm.

Lang also testified that immediately after the jury returned its verdict of guilty on October 2, Lang spoke to the foreman, Staulings, on the street outside the courthouse, that he asked what the most persuasive evidence was against the

defendant, and that Staulings told him about a certain documentary exhibit which the jury considered most important.

Upon the return of the order to show cause in this matter on October 10, at which time I set the motion down for an evidentiary hearing to be held on October 24, Thomas A. Bolan, a member of the firm of Saxe, Bacon & Bolan, and one of defendant's attorneys throughout this and the previous trial, stated, when asked by the court whether he wished to say anything:

"As to my own participation, I would prefer to defer answering that, if it should be necessary, to some future time, as to whether I had any knowledge."

At the hearing on October 24, Bolan said that he wanted to make a statement. He thereupon testified that although Lang had not specifically requested his authorization to employ Whelan to interview these jurors, Lang's action had Bolan's full approval and he took full responsibility for it. He said that he believed such interviews to be entirely proper and that "practically every trial that I have been involved in there have been interviews of jurors," not only at his instance, but in some cases at the instance of the opposing party as well. He specifically referred to the trial of another member of the firm of Saxe, Bacon & Bolan (which eventually resulted in an acquittal) after which he and the United States Attorney's office each caused the jurors to be interviewed, as they had after the abortive first trial of the present defendant. He said that such interviews in his experience were "common practice among trial attorneys."

Bolan and Lang each testified that he had no reason to believe that the jury had acted in any way improperly in its consideration of this case, or that any improper outside influence had been brought to bear upon it. They made it clear that the purpose of the interviews was not to secure evidence of any such impropriety. Bolan testified that "basically, what Mr. Lang and I have been interested in * * * is what evidence did influence the jury in their verdict * * *."

Whelan's testimony was to the same effect. He said that Lang had not told him that the jury had done anything it should not have done, or that anyone had brought improper pressure to bear on it, or that any fraud was involved.

Defendant Driscoll testified, after having been advised by the court that he was not obligated to do so and need not answer the court's questions. He testified that he had not known of Whelan's activities in interviewing the jurors and that he had not authorized the interviews or discussed them with anybody. As to the practice of the firm of Saxe, Bacon & Bolan of which he is a member, he said that although he had heard in a general way that after the trial of his partner jurors had expressed certain feelings, he had nothing to do with it because he was never in actual litigation.

Frank G. Raichle, defendant's trial counsel, stated to the court that he had not been aware of the interviewing of jurors and had not requested or authorized it.

Two questions have been argued on this motion, each of which must be considered and decided by the court: (1) whether the requested injunction against further interviewing of jurors in this case should be granted; (2) whether the authorization or approval of the interviews by certain of the attorneys was unethical conduct on their part warranting disciplinary action. The two questions, although somewhat related, are separate and distinct. The answer to one does not necessarily depend upon the answer to the other. Clarity will be furthered by considering them separately. I will first deal with the question of the appropriateness of injunctive relief.

The general principle applicable here was stated so admirably by Judge Prettyman in Rakes v. United States, 169 F.2d 739, 745–46 (4th Cir. 1948), cert. denied, 335 U.S. 826, 69 S.Ct. 51, 93 L.Ed. 380 (1948), in language which so clearly

expresses my own views that it merits quotation in full. He there said:

"The inviolability of the jury room from outside influence of any sort, actual or potential, is a prime necessity in the administration of justice. That unqualified rule requires that if a person, whether on the jury or not, knows of such outside influence, or an attempt at it, he must at once report his information to the court. The same rule requires that jurors are not to be harassed in any manner because of a verdict they have rendered. If jurors are conscious that they will be subjected to interrogation or searching hostile inquiry as to what occurred in the jury room and why, they are almost inescapably influenced to some extent by that anticipated annoyance. The courts will not permit that potential influence to invade the jury room. He who makes studied inquiries of jurors as to what occurred there acts at his peril, lest he be held as acting in obstruction of the administration of justice. Much of such conversation and inquiry may be idle curiosity, and harmless, but a searching or pointed examination of jurors in behalf of a party to a trial is to be emphatically condemned. It is incumbent upon the courts to protect jurors from it."

Similar opinions have been voiced by other courts which have considered this question. The state courts of New Jersey have a formal rule prohibiting an attorney, either by himself or through an investigator, from interviewing any juror with respect to the verdict or deliberations of the jury except on leave of court. In State v. La Fera, 42 N.J. 97, 199 A.2d 630 (1964), the court said (199 A.2d at 635):

"A jury deliberates in secrecy to encourage each juror to state his thoughts, good and bad, so that they may be talked out. 'Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world.' Clark v. United States, 289 U.S. 1, 13, 53 S.Ct. 465, 469, 77 L.Ed. 993, 999 (1932).

\* \* \* \* \* \*

"It is true that no settled rule bars extrajudicial, post-trial disclosures by a juror of his own views even though in cases of public interest the trial judge not infrequently cautions against such disclosures. Yet one of twelve may not be able to disclose his own part without revealing something the other jurors are entitled to have protected. Moreover the public too has a stake in the promise of secrecy to insure free debate in cases to come. In these circumstances it is appropriate to protect all the jurors against efforts of others to browse among their thoughts in search of something to invalidate their verdict."

The United States District Court for the District of New Jersey expressed its concurrence in these views in United States v. Provenzano, 240 F.Supp. 393, 412, 413 (D.N.J.1965), aff'd per curiam, 353 F.2d 1011 (3rd Cir. 1966), cert. denied, 384 U.S. 905, 86 S.Ct. 1340, 16 L.Ed.2d 358 (1966). And in United States v. Nystrom, 116 F.Supp. 771, 777 (W.D.Pa.1953), aff'd, 237 F.2d 218 (3rd Cir. 1956), the court summed it up in one succinct sentence:

"I am compelled to unequivocally disapprove the practice of interviewing a juror after a trial as to his state of mind during the trial."

Defendant cites two recent decisions, Parker v. Gladden, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966), and United States ex rel. De Lucia v. McMann, 373 F.2d 759 (2d Cir. 1967). In *Parker*, the Supreme Court reversed a defendant's conviction because of prejudicial remarks made by a bailiff to one of the jurors during the course of the trial. The Court held that defendant's right under the Sixth Amendment to be confronted by the witnesses against him had been thereby violated.

In United States ex rel. De Lucia v. McMann, the Court of Appeals vacated an order of the district court which had denied a defendant's petition for habeas

338

corpus to review his conviction in the New York courts. It appeared that the jury during the trial had visited the scene of the crime without the permission or knowledge of the court. The Court of Appeals said that it would afford the New York courts, which had refused to reverse defendant's conviction, another opportunity to reconsider the matter in the light of Parker v. Gladden. Following this decision, the New York Court of Appeals on reargument changed its previous decision and remitted the case to the trial court for a further hearing.*

In each of these cases the fact of the misconduct was proved by statements of jurors themselves which had been obtained by defendant's investigators after the trial. It can plausibly be argued that the decision in each case necessarily presupposes that it was proper for defendant to secure these statements in this fashion. But these decisions do not overturn in every case the salutary rule expressed in the judicial opinions previously quoted. Both *Parker* and *De Lucia* involved either improper conduct of the jury or improper external influence exercised upon them. In *De Lucia*, at least, the defendant had reason to suspect the existence of such conduct before he began the extensive jury inquiry. It does not follow from the fact that in those cases the court, impliedly at least, approved defendant's private investigation, that such an inquiry should be allowed in every case. There is no claim here of improper external influence or of jury misconduct. On the contrary, defendant's attorneys expressly testified that they had no reason to suspect any such misbehavior.

According to Bolan, the purpose of the inquiry was to find out "what evidence did influence the jury in their verdict,"

presumably, as defendant's counsel argues, to instruct these attorneys in the ways of juries as a guide to their trial strategy in future cases. I do not accept this explanation. It is apparent that the purpose was, in the words of the court in *La Fera*, "to browse among their [the jurors'] thoughts in search of something to invalidate their verdict." Why else would Whelan inquire whether the jury had "polled themselves"? Why would he argue the insanity defense by stating to Martin, "That's where the mental block came in, see?" It is significant that Whelan made it a point to tell the jurors that the previous jury had disagreed. Indeed, he went further in advising Martin about the juror at the first trial who had "stuck to his guns" in favor of acquittal.

Such statements amount to a thinly-veiled criticism by Whelan of this jury's decision, a not so subtle implication that this jury also should have "stuck to their guns," that they should have found defendant insane. This is not idle curiosity or laboratory research in trial technique for educational purposes. It is a "searching hostile inquiry," whether juror Martin recognized it as such or not.

In Bryson v. United States, 238 F.2d 657 (9th Cir. 1956), rehearing denied, 243 F.2d 837 (1957), cert. denied, 355 U.S. 817, 78 S.Ct. 20, 2 L.Ed.2d 34 (1957), the trial court at the conclusion of a criminal trial directed that no one should talk to the jury. Nevertheless, a newspaper reporter did so, and thereby developed the information that two of the jurors had not understood the meaning of the word "affiliated" which apparently played some part in the case. The defendant thereupon asked the trial court for permission to make inquiry of the jurors. The court refused. This or-

* United States v. Beach, 296 F.2d 153, 95 A.L.R.2d 342 (4th Cir. 1961), also cited by defendant, is not in point. There defendant raised the suspicion that the jury might have improperly conducted an experiment in the jury room. The Court of Appeals remanded the case with instructions to the District Court to in-

quire of the jurors about this. This is obviously different from permitting defendant to interrogate the jurors through a private investigator. Inquiry by the trial court, in a proper case, would seem to be much the preferable method of ascertaining the facts.

der was affirmed by the Court of Appeals which said (238 F.2d at 665):

"This and other courts have condemned the practice of interviewing jurors on the course of their deliberations in the jury room. It is incumbent upon the courts to protect jurors from the annoyance and harassment of such conduct."

This is a decision that the trial court, in a proper case, may forbid a defendant and his attorneys from communicating with the jurors after the verdict. It follows that this court has power to enjoin a defendant from doing so on a motion such as this. This is a proper case for such an injunction. Moreover, under the circumstances, an injunction should issue here, even though defendant's attorneys now claim that they do not intend to interview additional jurors.

I accept Raichle's statement that he was not a party to these activities. I also believe defendant's testimony that he did not know of or authorize these interviews. This affair will have no bearing upon the sentence ultimately to be imposed upon defendant for the crime of which he has been convicted. Nevertheless Bolan, Lang, and Whelan acted on defendant's behalf, although without his knowledge. The injunction should run against defendant and his attorneys and investigators.

I turn now to the ethical aspects of the case. Here the situation is confused by apparently contradictory opinions issued by the Committee on Professional Ethics of the American Bar Association and the comparable committee of the Association of the Bar of the City of New York.

Canon 23 of the American Bar Association's Canons of Ethics states in part:

"A lawyer must never converse privately with jurors about the case; and both before and during the trial he should avoid communicating with them, even as to matters foreign to the cause."

On March 10, 1934, the American Bar Association Committee on Professional Ethics issued Opinion 109, in which it answered in the negative an inquiry as to whether a lawyer, for his own guidance, may properly inquire of members of the jury, after the verdict, as to "how certain aspects of the case impressed them, what they thought of certain evidence on both sides of the case, and how certain members of the jury stood on certain questions." The Committee said:

"The committee is of opinion that, upon the facts stated, the conduct of the lawyer is unethical. It tends to destroy the secrecy which should, on account of ancient usage and public policy, safeguard the activities in the jury room."

The Committee also said:

"This opinion, of course, is not intended to extend to a situation where there has been a mistake in the announcing or recording of a verdict, and in the protection of his client's interests, it may be necessary for a lawyer to interview members of the jury to prevent a miscarriage of justice. Nor does it extend to a case where a juror has been guilty of fraud. See Clark vs. United States, 281 [289] U.S. 1, 53 Sup.Ct.Rep. 465 [77 L.Ed. 993]. Compare note in 47 Harvard Law Review 717 (Feb., 1934) on United States vs. Pleva, 66 F.(2d) 529 (C.C.A.2d, 1933)."

Subsequently in "Informal Decision" No. 535 dated October 6, 1962, the American Bar Association Committee on Professional Ethics ruled that a lawyer could not properly write to jurors after the case is over to thank them for their service. At the end of this opinion the Committee expressed a dictum as follows:

"Our Committee entertains the opinion, however, that after the trial, as a matter of self-education, or where necessary to prevent fraud or a miscarriage of justice, the lawyer may, with entire propriety, interview the jurors."

The Committee on Professional Ethics of the Association of the Bar of the City of New York has issued two opinions on this subject. On September 28, 1933, that Committee was asked substantially

the same question as was later propounded to the Professional Ethics Committee of the American Bar Association and which resulted in Opinion 109 quoted above. The Committee replied:

"The Committee, however, is of the opinion that there is no violation of professional ethics for an attorney to communicate with members of a petit jury after the jury has returned its verdict."

This opinion was contrary to Opinion 109.

On January 14, 1952, the Professional Ethics Committee of the Association of the Bar of the City of New York was asked the following question:

" 'Is it improper for an attorney to spend considerable time interviewing jurors after a trial in order to determine what factors influence their deliberations and how the matter may be more effectively presented at a subsequent trial of the same or similar issues?' "

The Committee replied:

"The Committee is of the opinion that it is not improper for an attorney to interview individuals who have been members of a jury that has been discharged. The Committee does not believe that Canon 23 of the Canons of Professional Ethics makes such action improper. Your attention, however, is called to Opinion 109 of the Committee on Professional Ethics and Grievances of the American Bar Association, which does not accord in all respects with this opinion."

■ In the present case Bolan argued that a New York lawyer should be able to rely on the opinions of the Committee on Professional Ethics of the Association of the Bar of the City of New York. He implied, although he did not say so expressly, that he had relied on them. The latest of these opinions, quoted above, makes the flat unqualified statement that:

"It is not improper for an attorney to interview individuals who have been

members of a jury that has been discharged."

Such a broad, undiscriminating treatment of the problem is unfortunate. Although it may be doubted that the Committee intended to approve or condone what has been done in this case, the brevity of the Committee's pronouncement leaves room for argument as to what it intended. Under these circumstances, although what was done here was improper and will be enjoined, on the ethical question I will give these attorneys the benefit of the doubt and will not recommend disciplinary action in this instance.

Settle order on notice.

Supplemental Opinion

Since my opinion granting the government's motion for an injunction in this case was filed on November 1, 1967, the American Bar Association has sent to me a copy of Formal Opinion No. 319, dated August 26, 1967, issued by its Committee on Professional Ethics. I was not previously aware of this opinion, nor, presumably, were any of the parties or counsel in this case, as it was not cited to me by either side. The opinion is not contained in the 1967 volume of the opinions of the Committee on Professional Ethics of the American Bar Association, doubtless because it was issued after that volume was printed.

This opinion modifies to some extent the Committee's Formal Opinion No. 109 and Informal Opinion No. 535 which I quoted in my opinion dated November 1, 1967. The Committee said:

"Certainly as to states in which the testimony and affidavits of jurors may be received in support or against a motion for new trial, a lawyer, in his obligation to protect his client, must have the tools of ascertaining whether or not grounds for a new trial exist and it is not unethical for him to talk to and question jurors.

\*  \*  \*  \*  \*  \*

"On the other hand, it would be unethical for a lawyer to harass, entice, induce or exert influence on a juror to obtain his testimony. The task of

being a good juror is not an easy one and lawyers should not in their efforts to represent clients do anything that will tend to make it more difficult to obtain qualified jurors."

The Committee also said that "it is not unethical, in States where it is not illegal, for the purpose of self-education, to communicate in an informal manner with jurors who are willing to talk. In so doing, however, great care should be used to protect the desire of particular jurors not to talk and to avoid harassment, enticement, inducement, or improper influence."

I note this opinion here for the sake of completeness. It does not affect, however, the conclusions expressed in my opinion dated November 1 either as to the impropriety of the interviewing that took place in this case, or as to the inappropriateness, under all the circumstances, of disciplinary proceedings here against the lawyers involved. Accordingly, I have signed the attached order submitted by the government.