**UNITED STATES of America**

**v.**

**Anthony PROVENZANO.**

Crim. No. 429–60.

United States District Court
D. New Jersey.

March 30, 1965.

David M. Satz, Jr., U. S. Atty., by Richard A. Levin, Asst. U. S. Atty., for the Government.

Wilentz, Goldman & Spitzer, by Warren W. Wilentz, Perth Amboy, N. J., for defendant, Zoloto, Karger & Zurkow, New York City, of counsel (Hyman L. Zoloto, Arthur Karger, and Alfred Donati, Jr., New York City, appearing).

SHAW, District Judge.

This is a motion for a new trial pursuant to Rule 33. The defendant, Anthony Provenzano, was charged by grand

jury indictment on November 15, 1960 with violation of 18 U.S.C. § 1951. Trial by jury began on May 23, 1963 and was concluded on June 11, 1963 with a jury verdict of guilty. Defendant appealed and his conviction was affirmed. U. S. v. Provenzano, 334 F.2d 678 (3rd Cir. 1964). Cert. denied, 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544. The mandate of the United States Court of Appeals was filed with the Clerk of this Court on December 31, 1964.

On January 4, 1965 defendant filed Notice of Motion in this court pursuant to Rule 33 seeking an order granting a new trial. On January 18, 1965 an amended Notice of Motion was filed. The relief sought is grounded upon allegations that a juror, Stephen J. Cassidy, Sr., was prejudiced against the defendant, Anthony Provenzano, and had failed to disclose the existence of such prejudice during examination on the *voir dire*. In connection with his application for a new trial, defendant also seeks to obtain an order of this court directing that inquiry be made by the United States Attorney as to the existence of additional evidence and information which might be material to the issue of defendant's guilt.

Nineteen affidavits were filed by defendant in support of his motion. Three of these affiants [1] subsequently furnished affidavits to the Government in which they retracted statements made in the affidavits filed by defendant with denial that such statements were made under oath. Eleven affidavits were filed by the Government in opposition to the motion including those of the three affiants who had retracted previous statements. Upon examination of the moving papers, the affidavits of the defendant and of the Government, the Court decided to hear the oral testimony of the affiants with direction that investigators employed on behalf of Provenzano be available for such inquiry as the Court deemed appropriate to determine the nature and scope of the investigation which had been undertaken. Pursuant thereto hearing was held.

At the time of the trial and for many years prior thereto the juror, Mr. Cassidy, was an employee of the Ford Motor Company and had been working at its plant in Mahwah, New Jersey since the time it was located there. He is a member of Local 906 UAW and has held various offices in the union. He was employed by the company as a cycle checker and, in connection with his employment, had occasion to visit the LCL dock (less than carload lot) where freight was handled. The dock was described as an area approximately 100 yards in length and 40 feet in width and would accommodate 18 trucks. There was an enclosed office located on the dock covering an area of approximately 20 feet x 30 feet. Within this enclosure several of the Ford Motor Company employees who are members of Local 906 have desks in close proximity to a desk occupied by Mr. Charles Giannone. Mr. Giannone had worked as a "switcher" and was a member of the Teamsters Union Local 560, of which Mr. Provenzano has been and still is president [2]. Subsequent to his employment as a "switcher", Mr. Giannone acquired an interest in the C & L Cartage Company and has conducted the business of that company on the same LCL dock. He still retains his membership in Teamsters Local 560.

It was on this LCL dock, both in the enclosed and outer area, where Mr. Giannone testified that he had from 200 to 250 arguments with Mr. Cassidy over a period of years prior to the Provenzano trial in which Mr. Cassidy expressed violent prejudice against Mr. Provenzano personally, the Teamsters and Mr. Hoffa. These arguments were alleged to have been loud and heated and to have taken place in the presence of a number of other employees of the Ford Motor Company who worked on the dock.

This dock was described as a very busy and noisy area with as many as 20

---

1. John Dougherty, Frank Durando and Ernie Prezioso.

2. Mr. Provenzano is also an international vice-president of the Teamsters.

to 30 people coming in and out during working hours. It should be mentioned at this point that there was also testimony of other arguments in which Mr. Cassidy is alleged to have engaged at other locations in the plant and at union meetings in which he expressed violent prejudice against the Teamsters, Provenzano and Mr. Hoffa. The principal witness for Provenzano as to these other arguments was Mr. Bladen.

Mr. Bladen had held office in Local 906 UAW from time to time. He was president of this union while the Provenzano trial was in progress. At the present time he is employed as an international servicing representative of UAW working out of Detroit, Michigan. He stated that he had heard Mr. Cassidy express himself on approximately 100 occasions violently condemning the Teamsters, Provenzano and Mr. Hoffa.

As indicated above, the principal witnesses as to the volume of vituperative statements by Mr. Cassidy condemning Mr. Provenzano, Mr. Hoffa and the Teamsters union were Mr. Giannone and Mr. Bladen. According to the testimony of Mr. Giannone, Cassidy, among other things, characterized Provenzano as a "racketeer", a "gangster", a "bum" and a "bad labor leader." In his testimony he stated, "You name it. He called him." This witness also testified that from time to time Mr. Cassidy would exhibit newspaper clippings and other literature containing derogatory comments about Mr. Provenzano, Mr. Hoffa and the Teamsters. Mr. Bladen testified that on the many occasions when he heard Mr. Cassidy express himself on the subject of the Teamsters union, he would refer to Mr. Provenzano, Mr. Hoffa and the Teamsters as "crooks", "racketeers" and "gangsters." Other epithets couched in obscene language were also included in the alleged expressions of Mr. Cassidy's opinion of Mr. Provenzano, Mr. Hoffa and the Teamsters.

If the testimony of these two witnesses is to be believed, it would follow that Mr. Cassidy suffered from an obsession on the subject of Mr. Hoffa, the Teamsters and Mr. Provenzano which bordered upon, if it did not amount to, hatred. He would, as the evidence discloses, be completely out of character on this one particular subject. He had no acquaintance with Mr. Provenzano and every witness who made any reference to his character or disposition described him as a quiet, mild-mannered, retiring man who was not inclined to be talkative or argumentative. There was also evidence that he was not inclined by disposition to be abusive or use obscene language.

In order to evaluate the probative value of the testimony of Mr. Bladen and Mr. Giannone, it is necessary to look to the sequence of events following the Provenzano trial, the framework of investigation out of which this evidence emerged, the motives that may have influenced it, and the degree to which there is credible corroboration.

It appeared from the affidavits filed and further developed at the hearing that a very extensive investigation had been conducted over a considerable period of time to discover evidence in support of a motion for a new trial. One of the investigators, Mr. Neidorf, testified that he had been employed to initiate an investigation as early as July of 1963 and that he had been conducting investigation intermittently since that month. The following excerpts from his testimony during the course of interrogation by the Court are quoted:

"Q. Mr. Neidorf, are you acquainted generally with the nature of the proceeding that is before the Court on a motion that was filed seeking a new trial on the ground of prejudice of a juror?

"A. Yes, sir.

"Q. Mr. Neidorf, in connection with that, were you employed to conduct any investigation?

"A. Yes, sir.

"Q. Can you tell the Court when you were first employed to initiate an investigation in this matter?

"A. About July of 1963.

"Q. And have you been conducting an investigation since that month?

"A. Intermittently and not continuously by any means."

He stated, however, in connection with alleged prejudice on the part of the juror, Cassidy, that he had only interviewed one witness, Mr. Charles Giannone, and that this interview took place on February 17, 1964. Upon further interrogation, it was developed that he had also interviewed the husband of another juror and had interviewed approximately 40 to 50 persons to investigate the background of a third juror.

Another investigator, James Scanzo, testified that he was employed on October 23, 1964 to conduct an investigation for the defendant. He interviewed fellow employees of the juror, Stephen Cassidy, and also conducted investigation in the neighborhood where Mr. Cassidy resided. He estimated the number of persons that he interviewed to be approximately 35 to 40 people. When it developed by interview that a person seemed to have knowledge of prejudice on the part of Mr. Cassidy and was willing to cooperate, arrangements were made for that person to visit the office of the defendant's attorney in New York City where further interview was conducted and affidavits prepared. Assistance in the conduct of this investigation was furnished by Mr. Giannone, Mr. Bladen and Mr. DeMarco. Mr. DeMarco holds the office of vice-president of UAW Local 906. He testified on behalf of the Government.

The affidavit of Henry G. Singer, trial and appellate counsel for Provenzano, was filed in support of this motion. He states in Paragraph 4:

"Towards the end of 1963 and during the early months of 1964, while the appeal in this case was pending before the United States Court of Appeals for the Third Circuit, I had several discussions with the defendant concerning some information furnished by a Teamster who was a member of the defendant's union, *indicating possible prejudice* on the part of the juror Cassidy against the defendant. *As I recall, however, neither the informant nor the investigator whom we used, Leon Neidorf, was able to obtain corroboration of the information,* and there did not seem to me to be any sufficient basis for initiating a motion for a new trial." (Emphasis supplied)

The affidavit of Hyman L. Zoloto, present counsel, was also filed. He states in Paragraph 2 of his affidavit:

"My firm was retained by the defendant Anthony Provenzano in the latter part of July 1964 to represent him in connection with a petition for a writ of certiorari in this case to the United States Supreme Court. I thereafter had occasion early in August 1964 to meet with Leon Neidorf, an investigator for the defendant. Mr. Neidorf told me that he had interviewed one Charles Giannone, who was a member of the defendant's Teamsters Local 560, and that Giannone had stated that he had had many arguments with one of the jurors in this case, Stephen Cassidy, prior to the trial, in which Cassidy had made derogatory statements about the defendant. *Mr. Neidorf further told me that Giannone could not furnish any corroboration of his statements, and that Giannone was a loyal supporter of the defendant.* It was my opinion that Giannone's statements alone, without further corroboration, would not be a sufficient basis for proceeding with a motion for a new trial, and I was informed that Henry G. Singer, the defendant's trial attorney herein, had expressed a similar opinion." (Emphasis supplied)

Mr. Giannone stated his age to be 29 and that he was in excellent physical condition. His appearance on the stand confirmed this. Mr. Cassidy's age was estimated at 50 and he was described as

a frail man [3]. According to Mr. Giannone's testimony, Mr. Cassidy would constantly taunt and torment him about the Teamsters and on one occasion Giannone threatened to "deck him." He explained this expression by saying he intended to hit him. There was also testimony by Mr. Giannone that when he, Giannone, became angry, Mr. Cassidy would walk away. Mr. Giannone was generally described as aggressive, extremely argumentative and not inclined to have any patience with anyone who criticized Mr. Hoffa, the Teamsters or his friend, Mr. Provenzano, with whom he was personally acquainted. In fact, one witness, Stanley Bloom, described him as an "argument center" and there was testimony to the effect that members of Local 906 UAW would "needle him" on the subject of the Teamsters in order to get him aroused.

It is urged on behalf of the defendant on the basis of Mr. Giannone's testimony that Mr. Cassidy, a mild-mannered, retiring man not inclined to be talkative or argumentative, would come down to check on incoming freight that might be on Giannone's trailers two or three times a week and in each instance would provoke an argument by a most abusive characterization of Provenzano, the Teamsters and Mr. Hoffa. According to Mr. Giannone, this occurred two or three times a week over the period from 1959 until the time of the Provenzano trial in May of 1963. If believed, it would amount to constant and deliberate invitation of the wrath of Mr. Giannone up to the point of physical conflict.

Mr. Giannone continued his work in the LCL office on the dock during the period while the Provenzano trial was in progress. As far as can be determined from his testimony, he did not note the absence of Mr. Cassidy over that three week period and according to his testimony, he was not aware of the fact that Mr. Cassidy had been serving on the Provenzano jury during the trial.

There is evidence from which it may be inferred that the fact of Mr. Cassidy's jury service was known among members of Local 906 UAW working at the Ford plant while the trial was in progress. The witness, Orrie Helms, a friend of Mr. Giannone's, who testified on behalf of the defendant stated that he knew Mr. Giannone for at least eight years. He stated during the course of his testimony:

"Court: * * *. Did you know during the time of the Provenzano trial, and during the course of it and before the end of it, that Mr. Cassidy was serving as a juror?

"Witness: Well, I knew it, yes, because I knew from, you know, like people was talking about Cassidy was on this Provenzano jury.

"Court: Did these conversations occur when the trial was in progress?

"Witness: I did hear it once or maybe twice. I don't know, maybe three times. I did hear that Steve Cassidy was on the jury."

There is also other evidence from which the inference may be drawn that it was generally known among personnel at the Ford Motor Company plant, acquainted with Mr. Cassidy, that he was absent from work because of jury service on the Provenzano jury. Mr. Giannone testified that he did not become aware of this fact until after the trial. It was then, according to his testimony, that he had his final violent argument with Cassidy because he had served on the jury and had voted for the conviction of Mr. Provenzano. The substance of Mr. Giannone's version of this argument is that he directed angry criticism against Mr. Cassidy because he did not disqualify himself from service on the jury. The witness, Mr. Bloom, foreman of the LCL dock testified that he overheard this argument and that, among other things, Giannone said to Cassidy, "You are a hell of a union man to convict Tony Pro."

---

3. There was testimony that he has suffered recent heart attacks.

Subsequent events tend to shed light upon the more likely of the divergent inferences that may be drawn from the testimony as to Giannone's state of mind at the time of this argument with Mr. Cassidy. There is no dispute about his friendship with Provenzano and his zealous loyalty to him. Mr. Giannone professed it in no uncertain terms and it was general knowledge among those who knew him at the Ford Motor Company plant. Nevertheless, he did not communicate his knowledge of Mr. Cassidy's prejudice to Mr. Provenzano or anyone in Teamsters Local 560, of which he was a member, until November or December of 1963. His testimony on cross-examination is quoted as follows:

"Q. When you learned he was a juror in the case did you communicate your knowledge about Mr. Cassidy's beliefs to Mr. Provenzano or anyone in the Teamster Local 560?

"A. Yes, sir.

"Q. When was that?

"A. On November or December of '63.

"Q. November or December '63?

"A. That is right.

    *    *    *    *    *    *

"Q. Five or six months after the trial was over.

"A. That is right, sir.

"Q. Prior to November or December of '63 did you ever—you knew Mr. Provenzano personally, didn't you?

"A. Yes, I knew him.

"Q. Did you ever go to Mr. Provenzano and tell him about what you knew of Mr. Cassidy prior to November or December of '63?

"A. You mean before?

"Q. That is right.

"A. No, sir.

    *    *    *    *    *    *

"Q. Whom did you speak with in connection with the Teamster Local 560 to communicate these thoughts?

"A. Mr. Sal Briguglio.

"Q. Briguglio isn't it?

"A. Briguglio.

"Q. And under what circumstances did you meet Mr. Briguglio? Where did you meet him?

"A. Local 560 union.

"Q. You went down there?

"A. I went down—I didn't go down for that purpose. I went down for the purpose of a union problem, whatever the problem was at that time.

"Q. And this came up later?

"A. As we were talking about the Provenzano case, yes.

"Q. Almost incidentally you mentioned to Mr. Briguglio what you knew about Mr. Cassidy?

"A. That is right."

According to the affidavit filed by Mr. Briguglio he is a business agent of Local 560. Apparently the information furnished to him by Mr. Giannone during November or December of 1963 did not excite immediate attention despite the fact that investigation had been initiated by retention of the investigator, Mr. Neidorf, as early as July, 1963. According to Briguglio's affidavit, Mr. Giannone told him that he had met with Leon Neidorf, Provenzano's investigator, some time in the latter part of February or early March, 1964. Mr. Giannone's testimony on this is quoted as follows:

"Q. After you met with Mr. Briguglio and advised him of your knowledge of Mr. Cassidy's supposed bias, what happened next? What did Mr. Briguglio say to you?

"A. He asked me if I would be willing to tell my story to an investigator and I said I would.

"Q. What happened next?

"A. In February of '64 a Mr. Neidorf came to me.

"Q. Leon Neidorf, is that correct?

"A. Yes."

Reference is made again to Paragraph 4 of the affidavit of Henry G. Singer, trial and appellate counsel for Provenzano. His statement does not indicate that he was particularly impressed with whatever Mr. Neidorf learned from his interview with Mr. Giannone. Mr. Singer refers to some information " * * * indicating *possible* prejudice on the part of the juror Cassidy against the defendant." (Emphasis supplied) This appraisal of the information furnished by Mr. Giannone during February, 1964 does not indicate that Mr. Singer was then apprised of testimony which Mr. Giannone could offer such as was adduced at this hearing.

Thereafter we find another substantial lapse of time before anything further was done. It was in the Fall of 1964 that Mr. Giannone received a call from Mr. Briguglio as a result of which Mr. Giannone went to Mr. Zoloto's office in New York.

After the Notice of Motion for a new trial was filed agents of the Federal Bureau of Investigation attempted to interrogate Mr. Giannone as to what he knew about the Cassidy matter. He admitted that he refused to discuss it and also admitted that he had told the agents that he was doing so upon advice. When questioned during cross-examination on the stand as to whom the advice came from, he stated, "I advised myself."

Mr. Giannone impressed the Court as an intelligent and articulate witness. The existence of zealous effort on his part to assist in the discovery of evidence that would support a motion for a new trial was unmistakable. He played the role of witness, investigator and process server. Reference at this point might be made to certain testimony of the witness Orrie Helms, who was called to testify on behalf of the defendant. This testimony is quoted as follows:

"Q. Mr. Giannone is a pretty good friend of yours?

"A. That's right.

\* \* \* \* \* \*

"Q. Who first approached you about these arguments that took place between Mr. Giannone and Mr. Cassidy?

\* \* \* \* \* \*

"A. That was Mr. Giannone. He came to me and asked me—he said, 'Orrie, you remember when we used to have those arguments with Steve Cassidy?' I told him, 'Yes.' He said, 'Would you do me a favor?' I said,—'I want you to sign a statement about him because we would like to get Tony a new trial.' So I say, 'Yeah, okay, I'll do it.' He was a friend of mine. I said, 'Okay, I'll do it.' That's how it happened."

The Court now turns to the testimony of Mr. Bladen. It seems that he, like Cassidy, had been active over a long period of time in the local union politics. He admitted that he and Mr. Cassidy were always on opposing tickets during union elections and that they were political foes. When asked if he would call Mr. Cassidy a friend, he stated, 'No, I wouldn't categorize him as a friend." He did, however, state consistently with the testimony of other witnesses, that Mr. Cassidy was a quiet and retiring man and not argumentative except on the subject of Teamsters. He could not recall that Mr. Cassidy was argumentative on any other subject. He stated, " * * * invariably he would be well contained. But on that subject, to use the expression, he seemed to go out of orbit in some fashion."

As noted above this witness testified that on approximately 100 occasions he had heard Mr. Cassidy express himself very forcefully in condemnation of Mr. Provenzano, Mr. Hoffa and the Teamsters. He stated in one part of his testimony that he knew that Mr. Cassidy was sitting as a juror in the Provenzano case while the trial was in progress, and at another point that he did not. According to his testimony, he had personal knowledge of the violent prejudice of Mr.

Cassidy toward Provenzano. It seems, however, that this knowledge came to light only after a discussion that he had with his brother-in-law, Mr. Puglio, at Bridgeport, Connecticut some time in the late Spring or early Summer of 1964. His testimony is quoted as follows:

"Q. When was the first time you made known to anybody connected with Mr. Provenzano the facts that you have related here today of approximately one hundred arguments you heard Mr. Cassidy engage in on the subject of Provenzano?

"A. The first occasion I discussed this with someone was the incident where I had gone to Bridgeport, Connecticut to visit my brother-in-law for a weekend, and at that point mentioned the fact *that I had become aware shortly after the trial of Tony Provenzano* that a member of our local union had been a member of the jury in that case." (Emphasis supplied. Compare with other parts of his testimony that he was aware of Mr. Cassidy's jury service while it was in progress.)

By coincidence, Mr. Bladen's brother-in-law, Mr. Michael Puglio, was a close friend of Fred J. Roberto, who is secretary-treasurer of Local 191 of the International Brotherhood of Teamsters and also president of Joint Council 64. Mr. Roberto had known Anthony Provenzano for many years. This is set forth in his affidavit filed on behalf of defendant. A meeting of Mr. Bladen with Mr. Provenzano followed some time during September of 1964. One day later Mr. Bladen met with Mr. Zoloto in Bridgeport, Connecticut. Thereafter, during December of 1964 he went to Mr. Zoloto's office in New York. At this meeting with Mr. Zoloto he furnished names of persons to be interviewed, among which was the name of Mr. De-Marco, vice-president of Local 906 UAW. Mr. DeMarco also visited Mr. Zoloto at his New York office and furnished a list of names of persons to be interviewed.

The Court observed Mr. Bladen during his direct and cross-examination, and more closely when he was called as a rebuttal witness. It was then that the impression developed that he was not a disinterested witness. Inconsistencies in his testimony, the extent to which he was able to relate from recollection specific incidents and the text of conversations he had overheard, the opportunity that he had on such occasions to recall accurately in context what occurred, plus his demeanor on the stand, cast considerable doubt in the mind of the Court as to the credence which it should accord to his testimony. Moreover, he like Giannone, seemed to take belated interest in the effort to discover evidence of Cassidy's prejudice and to lend assistance over and beyond what might be normally expected of the average person under like circumstances. Once his interest was triggered by the meeting with his brother-in-law in Connecticut during the Summer of 1964, followed by the intervention of Fred J. Roberto, he was affirmatively enlisted in the cause.

The process generated by the efforts of Mr. Giannone and Mr. Bladen, of obtaining names of persons who were present when Mr. Cassidy is alleged to have made his prejudicial remarks, was a continuing one and it would serve no purpose at this point to list all of the names that were furnished. It will suffice to say that the production of corroborating evidence was meager when considered in the light of the far-reaching investigation that had been conducted. Moreover, such as was obtained, when considered together with the evidence adduced on behalf of the Government, was not of that persuasive quality which induced belief in the mind of the Court.

█ It is true that the main thrust of most of the evidence adduced on behalf of the Government was, in one sense, of a negative character. It consisted chiefly of testimony of witnesses who had not heard Mr. Cassidy express any prejudice against Mr. Provenzano. Normally

such evidence would have very little, if any, value for the purpose of refuting affirmative statements of persons who heard remarks by Mr. Cassidy. But here it must be considered that witnesses who testified on behalf of the Government were alleged by Mr. Giannone and Mr. Bladen to have been present when the prejudicial statements were made with opportunity to overhear what Mr. Bladen and Mr. Giannone described as the impassioned, loud, heated and intemperate characterizations of Anthony Provenzano, Mr. Hoffa and the Teamsters. Moreover, many of the persons named by Mr. Giannone and Mr. Bladen as having been present when Mr. Cassidy made prejudicial statements, thereby having knowledge thereof, were not called upon to submit affidavits or testimony. It may be inferred that they would not, if called to testify, have furnished the desired corroboration.

The Court was impressed with the testimony of Mr. DeMarco, vice-president of Local 906 UAW. His answers to questions were responsive and forthright. There were minor inconsistencies associated with explanation of the circumstances which drew him into the matter and regret that he had become involved at the instance of Mr. Bladen. He had been acquainted with Mr. Cassidy for approximately 15 years both as a fellow officer in Local 906 and as an employee of Ford Motor Company. He was not an ally of Mr. Cassidy in union politics. When Mr. Cassidy was running for office he opposed his election. He testified that he had attended membership and executive committee meetings with Mr. Cassidy and that with one exception he had never heard him make any critical remarks about the Teamsters. He recalled that in a national election during the year 1960 Mr. Cassidy " * * * did pass some remark about the Teamsters as a whole backing up a Republican candidate when labor, as anyone knew, labor was always tied in with the Democratic party." He also testified that he had never heard Mr. Cassidy speak of Anthony Provenzano either to him or any-

one else and that he had never seen him exhibit any newspaper clippings relating to Anthony Provenzano.

He knew that Mr. Cassidy was sitting as a juror in the Provenzano trial during the trial and had directed that fact to Mr. Bladen's attention. Accurate statement of this is best made by reference to the pertinent excerpts of his testimony:

"Q. You spoke to Mr. Bladen, did you not, and called his attention to the fact that Cassidy was a juror? Do you recollect that?

"A. Yes, I had heard that. I called it to Bladen's attention.

"Q. You called it to Bladen's attention, did you not?

"A. Yes.

"Q. Is that when you discussed it with him for the first time?

"A. No, sir.

"Q. You had discussed it with him before?

"A. No. It was after the trial. *This was during the trial that I had discussed that he was out on jury duty and he was serving on the Provenzano jury.*" (Emphasis supplied)

He admitted going with Mr. Bladen to Mr. Zoloto's office on the evening of October 23, 1964 and having a conversation with Mr. Zoloto at that time. He also admitted that he told Mr. Bladen and Mr. Zoloto that he thought it was a little unusual to have an officer of one union sitting on a jury trying an officer of another union. His testimony with respect to what occurred on that evening is quoted as follows:

"Q. Didn't you tell him on that very evening that you couldn't understand why Tony Provenzano's lawyer allowed Cassidy to sit on the Tony Provenzano jury? Do you remember telling him that?

"A. I did, sir, yes. I remember saying this. I don't know if it was October 23rd I said this.

"Q. And would you tell me why you said that to him?

"A. I thought it was a little unusual to have—this was my opinion, of course—I thought it was a little unusual to have an officer of another union sit on a jury trying an officer of another union. I thought this was unusual."

As noted above, Mr. DeMarco, a fellow officer of Mr. Cassidy, aligned politically in the union with Mr. Bladen, attended membership and executive Committee meetings with Mr. Cassidy. His testimony was unequivocal as to the fact that Cassidy never discussed Provenzano with him and that he had never heard Cassidy speak of Provenzano or exhibit any newspaper clippings relating to him.

He did admit that he furnished Mr. Zoloto with the names of persons to be interviewed, stating in substance that he had no knowledge of any assistance that these persons could offer, but that they might be persons who could have been present if the alleged remarks attributed to Mr. Cassidy had been made. He was questioned as to the purpose of going to Mr. Zoloto's office and the purpose of giving names of persons to be interviewed to Mr. Zoloto. Pertinent excerpts of his testimony on this are quoted as follows:

"Q. What was the purpose of your giving these names to him?

"A. This is the main reason. When I went there with Tom Bladen and Tom Bladen had made his assertions, what Cassidy said during this board meeting in 1961, again I told Mr. Zoloto at that point, 1961, I wasn't in office, so I did not attend this board meeting where this allegation took place.

\*    \*    \*    \*    \*    \*

"A. I felt at the time when Tom Bladen had told me that Steve Cassidy had made this remark at this executive board meeting

—and I thought at that time if Tony Pro didn't get justice under these circumstances here I would certainly cooperate to the fullest of my extent to see that justice would be carried out in ｣uch a case.

\*    \*    \*    \*    \*    \*

"Court: Mr. DeMarco, why did you feel any obligation to go to Mr. Zoloto's office?

"Witness: Your Honor, as I stated before, based on the fact that Thomas Bladen had told me that a prejudiced juror had sat on a jury, I thought that Tony Provenzano at that time got an unfair trial. I thought if I can cooperate to the extent of getting Mr. Provenzano a fair trial, I didn't see any harm in it. This is why I cooperated. Again I gave these names out of my goodness and with the thought in mind to cooperate, to see that justice was done. This is the only reason I did this."

His testimony as to discussion he had with Mr. Bladen while the trial was in progress is quoted as follows:

"Court: Did Mr. Bladen during the progress of the trial ever make any remarks to you with respect to that trial, if you recall?

"Witness: No. The only remarks I can recollect, to the best of my knowledge, was that again it was very unique—at least we thought so, we don't know the procedures of courts of laws—for one union official to be sitting trying another union official of another union. This is the only thing."

It seems from the more reasonable and logical inference to be drawn from the testimony of Mr. DeMarco, that his initial interest in this matter was generated by his friend, Mr. Bladen, based upon something Mr. Bladen said had oc-

curred at a union board meeting and upon Mr. DeMarco's doubt as to the propriety of an officer of one union sitting as a juror in the trial of a case involving the officer of another union. No doubt he was unaware of the fact that on the *voir dire* Mr. Cassidy had made a full disclosure of the fact that he was a member of Local 906 UAW and was an officer of that union. Mr. DeMarco's objective attitude in the matter at the time of hearing, and his reluctance even at that time, to express any personal opinion of his belief in what Mr. Bladen had told him concerning Mr. Cassidy is reflected in the following testimony:

"Q. What was the purpose of your going over there?

"A. What was the purpose, sir? [Referring to trip to Mr. Zoloto's office.]

\* \* \* \* \* \*

"A. I felt at the time when Tom Bladen had told me that Steve Cassidy had made this remark at this executive board meeting —and I thought at that time if Tony Pro didn't get justice under these circumstances here I would certainly cooperate to the fullest of my extent to see that justice would be carried out in such a case.

"Q. You went over there on that basis?

"A. Yes, sir, on Tom Bladen's say so.

"Q. You believed Tom Bladen.

"A. I believed him *at the time*.

"Q. Do you believe him now?

"A. *I don't think he would lie, sir.*"
(Emphasis supplied)

Though marked as a Government exhibit, G–9 was offered in evidence by counsel for the defendant without objection on the part of the Government, after cross-examination of Mr. DeMarco as to what he had stated to agents of the Federal Bureau of Investigation when interviewed by them on February 4, 1965. Exhibit G–9 is a report of that interview

setting forth what Mr. DeMarco had stated. It is not inconsistent in any substantial detail with the testimony that he gave in court. Moreover, it sheds further light on the nature of the investigative efforts to find corroboration for the statements of Mr. Bladen and Mr. Giannone.

Mr. Dougherty was called as a witness on behalf of Provenzano. He was employed in the inner LCL office where Mr. Giannone's desk was located and he had worked there prior to the Provenzano trial. He stated that he had not overheard any discussions or arguments between Mr. Giannone and Mr. Cassidy " \* \* \* of any kind." Counsel for defendant pleaded surprise. This witness had furnished an affidavit which was filed on behalf of the defendant but subsequently retracted statements made therein in an affidavit filed on behalf of the Government. In view of the contradictory statements the Court allowed counsel for defendant considerable latitude in the conduct of further interrogation of this witness. It would serve no purpose to review the testimony of Mr. Dougherty in detail, but significant excerpts thereof developed by counsel for defendant may be quoted:

"Q. A month after you spoke to Mr. Zoloto, Mr. Scanzo came with this paper [referring to affidavit filed on behalf of Provenzano] to you and after reading it twice you signed it.

"A. Yes.

"Q. Why, if so many portions of this paper were false did you sign it?

"A. Because I wasn't sure they were false then. As I said before, I didn't give it the proper thought. I was new on the job. I was upset over the new job and I signed it.

"Q. What made you find out?

"A. I signed it, if you want to say, as a favor in a way—if you want to say as a favor in a

way. Mr. Giannone and I are friends.

"Q. Mr. Giannone is not the one who arranged for you to see Mr. Zoloto, is he?

"A. No.

\*      \*      \*      \*      \*      \*

"Q. You didn't know Mr. Scanzo before he walked into your house, did you?

"A. No.

"Q. And you told Mr. Scanzo, didn't you, that there was much argument between Chuck Giannone and Steven Cassidy, didn't you?

"A. I told him at that time, yes, I thought there were.

"Q. So you weren't doing Mr. Giannone any favor when you told him that, were you?

"A. Well, when Giannone liked Mr. —I know he was an avid fan for Mr. Pro.

"Q. You knew that Mr. Giannone was an avid fan of Mr. Pro?

"A. He always supported him. He supported him.

"Q. And because you knew that Chuck Giannone was an avid fan of Tony Pro, you told a fellow you never saw in your life, that there were arguments between Chuck Giannone and Mr. Cassidy, is that right?

"A. That influenced my thinking.

"Q. What else influenced you if it wasn't that?

"A. That's it. I told you I didn't give the proper thought. I was confused about the date. I was confused about the argument."

According to Mr. Dougherty, he was and still is a friend of Mr. Giannone on a social basis. They had been together at the race track and played touch ball every Sunday during the winter and softball during the summer. The witness was obviously nervous on the stand. It was the Court's impression that he was trying to tell the truth but found himself in an awkward position because of the statement that he had signed for Mr. Scanzo. It can certainly be said, however, that his testimony does not corroborate the testimony of Mr. Giannone.

Mr. Bloom testified that he was employed by the Ford Motor Company as foreman and had a desk in the LCL office since 1959 next to the desk of Mr. Giannone and had customarily worked side by side with Mr. Giannone during the work day. He was one of the persons alleged to have knowledge of the arguments between Mr. Giannone and Mr. Cassidy during the course of which Mr. Cassidy made his derogatory remarks and further that he intervened at times telling them to "Break it up." According to his testimony, he only heard one argument which occurred after the trial when Mr. Giannone stated to Mr. Cassidy, "You are a hell of a union man to convict Tony Pro." Cassidy's reply, according to Mr. Bloom's testimony, was, "I did what I thought I had to do." He also testified that Mr. Cassidy had never argued with him about, or discussed Anthony Provenzano and that he had never heard Mr. Cassidy argue with anybody about Anthony Provenzano or the Teamsters prior to the Provenzano trial.

It did develop during the course of Mr. Bloom's testimony that he had made complaints about Mr. Giannone's conduct in the LCL office and it may be inferred that the relationship between the two was not cordial. During the course of giving his testimony, he was completely at ease on the stand, was responsive in his answers to questions and impressed the Court as a very independent minded person whose thinking on any subject could not be readily influenced.

Mr. Scantland held the position of supervisor at the Mahwah plant of the Ford Motor Company and his office was located on the LCL dock. He stated that he was a friend of Mr. Giannone and socialized with him. He described his acquaintance with Mr. Cassidy as "through work only." He testified as to Mr. Cassidy's visits to the LCL area, "It could

be quite a few times or once a day. Usually they come down once a day." He stated that Mr. Cassidy never engaged in any argument with him with respect to Provenzano or the Teamsters and he did not corroborate Mr. Giannone's version of the alleged arguments with Mr. Cassidy. He also testified that Mr. Cassidy had never shown him any newspaper articles relating to Mr. Provenzano or the Teamsters and he had not noticed that he did it with anyone else. In answer to a question on this he stated, "That is a tough question. In my presence. I would have to answer that no. I never noticed. It could have been though. It is a big yard. It could be." Here again the Court was impressed with a refreshing air of frankness coupled with reservation not to speak on matters of which he had no personal knowledge.

Mr. Snaguski testified that he was employed by the Ford Motor Company in Mahwah as a utility receiving checker with a desk on the LCL dock in the receiving department. This desk was located next to that of Charles Giannone and George Squires. He was acquainted with Mr. Giannone and Mr. Cassidy and did not corroborate Mr. Giannone's version of the numerous arguments that he had with Mr. Cassidy during which Mr. Cassidy made derogatory remarks about Provenzano. He stated that he had never heard such arguments and that Mr. Cassidy had never argued with him about the Teamsters or Mr. Provenzano.

The testimony of Mr. Squires is of an entirely negative character and the Court attributes no probative value to it. This witness also had a desk in the LCL office in close proximity to that of Mr. Giannone and corroborated the fact that Mr. Cassidy did come into the LCL office approximately 2 to 3 times a week. But in answer to a question as to whether he had ever heard Mr. Cassidy and Mr. Giannone engage in any arguments relating to Mr. Provenzano or the Teamsters, he replied:

"Well, I'm on the phone and I'm so busy, to tell you the truth I can't find out who's arguing about who. I might have two phones going steadily all day, and there is arguments going on, but I don't turn around. I don't have the time to turn around and see who is arguing or what, and I can't say who is arguing at any time. To my recollection, I couldn't say. I don't remember."

Mr. McConnell testified that he was employed by the Ford Motor Company as a cycle checker and had known Mr. Cassidy for about 25 years and was very friendly with him. He described Mr. Cassidy as a "very quiet, reserved fellow." According to his testimony he had never heard Mr. Cassidy discuss Anthony Provenzano. He also stated that Mr. Cassidy never showed him or anyone else in his presence any newspaper clippings relating to Anthony Provenzano. He mentioned literature that had been posted around the premises, presumably on the LCL dock, during the election of officers of Teamsters Local 560. According to him there was literature for each party, some favoring Mr. Provenzano and some opposing him. There was evidence that the practice of posting campaign literature on the Ford Motor Company premises was not approved by the company and that as it appeared it would be removed.

Mr. McConnell described traffic in and out of the LCL office as follows:

"Well people come in and out all day long. It is the main traffic office for the freight department and for the dock, the production line. The phone rings continuously. There are about six or seven phones at least and twenty or thirty people are in and out every few minutes.

\*　　\*　　\*　　\*　　\*　　\*

"As I said, 20 or 30 people could be in and out at the same time."

Mr. Mahoney worked on the receiving dock of the LCL platform. He had been acquainted with Mr. Cassidy for about 25 years and he did recall that there were discussions between Mr. Giannone and Mr. Cassidy on the platform. He stated with respect to the number, "Well, it could average 3, 4, 5 times," and that, "Most of their arguments were regarding benefits. One [union] was better than

the other." He added that Cassidy made the statement that " * * * all truck drivers were thieves. Tony Provenzano was a gangster, racketeer and used strong arm methods." He never heard Mr. Cassidy argue about or discuss the Teamsters and Anthony Provenzano with anyone other than Mr. Giannone. He never heard Mr. Giannone express his feelings about the Teamsters or Mr. Provenzano and did not know that Mr. Giannone supported Mr. Provenzano. He, like some of the other witnesses produced by the defendant, was brought to court by subpoena served by Mr. Giannone. Such corroboration of the testimony of Mr. Giannone and Mr. Bladen, which the testimony of this witness purported to afford, was not convincing. The same is true with respect to the testimony of Mr. Prezioso and Mr. Durando.

The testimony of one other witness produced by defendant deserves some attention. This witness, Albert James Donnelly, was discovered on the eve of the last day of the hearing. He worked in the cushion department of the Ford plant at the end of the assembly line. Except for his *own* comment, allegedly made to Mr. Cassidy about a week or more after the trial, his testimony is not only completely devoid of any corroboration of prejudice on the part of Mr. Cassidy, but rather tends to support an inference that Mr. Cassidy entertained no prejudice toward Provenzano. According to Donnelly's testimony, Mr. Cassidy had mentioned the Teamsters and Hoffa in conversations on many occasions but had not been heard to mention Mr. Provenzano.

It should also be mentioned that the circumstances resulting in the discovery of this witness to appear on behalf of Provenzano indicate again a zealous personal interest in the matter on the part of Mr. Bladen to assist in the effort to set aside the jury verdict and obtain a new trial. Pertinent excerpts from the testimony of Mr. Donnelly are quoted as follows with emphasis supplied:

"Q. And did you see Mr. Cassidy after the trial?

"A. Yes.

"Q. Did you have a conversation with him at that time?

"A. Well, I met Mr. Cassidy about a week, a week and a half after the trial and I approached him because it bothered me that he was on the jury. I asked him " 'Where did you get the nerve to sit on a case of that fashion, you being an officer of our union? You should be ashamed of yourself. You couldn't give an honest opinion about it the way you feel and the way the whole UAW feels about the Teamsters.'

"Q. What did he say to you?

"A. He didn't answer me. He just gave me a smirk and walked out of the office. It was in the plant, the union office in the plant.

"Q. Now when was the first time that you were asked to testify in this particular case?

"A. Yesterday, last night.

"Q. When was the first time that you spoke to any of the lawyers for Mr. Provenzano?

"A. Last night.

"Q. *Who introduced you to those lawyers in this particular case?*

"A. *Mr. Bladen introduced me to some of them.*

"Q. *When did that take place?*

"A. *Last night at about eight o'clock.*

"Q. *When was the first time that you told this story to anybody?*

"A. *Last night.* They were asking me all kinds of questions and I just told them what I knew about Steve Cassidy and the Teamsters.

"Q. *When was the first time that you mentioned it to Mr. Bladen?*

"A. *Mentioned which?*

"Q. *This story.*

"A. *Yesterday I started talking about it.*

\* \* \* \* \* \*

"Q. Are you sure of that now?

"A. Yes.

\* \* \* \* \* \*

"Q. You are a very close friend of Mr. Bladen, aren't you?

"A. Yes. I know Mr. Bladen for years.

"Q. And you are a close friend of his?

"A. Yes.

\* \* \* \* \* \*

"Q. Approximately how many conversations prior to the Provenzano trial did you hear Mr. Cassidy discuss Mr. Provenzano or the Teamsters?

"A. *Well, Provenzano was not mentioned to my knowledge. He may have been through the conversation, but the Teamsters and Hoffa was mentioned on many occasions.*

"Q. In other words, is it your testimony that prior to the trial you cannot now swear there was any occasion on which Mr. Cassidy mentioned Mr. Provenzano in your presence?

"A. It was mainly Hoffa and the Teamsters. Provenzano may have been mentioned but I cannot say.

"Q. You are not prepared to testify under oath that Mr. Provenzano was mentioned, is that correct?

"A. Yes.

\* \* \* \* \* \*

"Q. Who communicated with you last night about testifying in this matter?

"A. I was speaking to the attorneys.

Q. Who first communicated with you? Who got hold of you first?

"A. Mr. Bladen called me and said he was in town, would I like to meet him. So I went down and met him and I was introduced to the attorneys.

"Q. Where did you meet him?

"A. At the Americana Hotel.

\* \* \* \* \* \*

"Q. Who was present at the meeting last night other than Mr. Bladen and yourself?

"A. One of the attorneys, Al. I can't think of his last name.

\* \* \* \* \* \*

"Q. Over these drinks with Mr. Bladen and one of the attorneys for Mr. Provenzano, Mr. Donati, how did Mr. Bladen bring up the possibility of your testifying in this matter?

"A. Well, it wasn't to him. It was Al mentioned what they know about Steve Cassidy and the case, and he asked me several questions pertaining to it. I just answered what I knew.

"Q. Almost incidentally and casually, is that right?

"A. Yes, more casually than anything.

\* \* \* \* \* \*

"Q. And what was the next thing that happened? What did Mr. Bladen say to you on this occasion?

"A. Mr. Bladen left and I stayed with Al. He kept asking me questions and later we went up to the attorney's office.

"Q. Mr. Zoloto's office?

"A. Yes.

\* \* \* \* \* \*

"Q. In other words, would it be fair to say, Mr. Donnelly, that your appearance here today is just a coincidence because you had cocktails with Mr. Bladen, is that right?

\* \* \* \* \* \*

"A. *I mentioned it to Tom two weeks ago. When I heard he*

signed an affidavit I said if anybody approached me I would be glad to mention what I know. That is all." [Compare with previous testimony.]

In connection with corroboration of the testimony of Mr. Giannone, the Court has, among other things, taken into consideration on the one hand the noise and distractions that may have been prevalent in the LCL office making it difficult for others in that office to overhear what Mr. Cassidy and Mr. Giannone discussed. On the other hand, the Court has also taken into consideration the close proximity of any such discussions to those who occupied that office and testified, as well as the alleged fact developed by testimony of Mr. Giannone, that these arguments were more or less continuous from 1959 until the Provenzano trial began in May of 1963. With respect to corroboration of Mr. Bladen's testimony, the Court has, among other things, taken into consideration the wide acquaintance which Mr. Cassidy had among union members by reason of his activities and his frequent attendance at meetings over many years. It seems to this Court reasonable to assume that if Mr. Cassidy had held and constantly expressed the views attributed to him by Mr. Bladen over a period of several years, that such would be a matter of wide-spread knowledge among the membership and officers of Local 906 and that substantial, timely and effective corroboration would not have been difficult to obtain.

By way of explanation for the lack of corroborating evidence or the persuasive quality of such as was produced, counsel for defendant suggests that the rank and file membership of Local 906 was not friendly to the Teamsters and did not want to get involved, particularly those who had political ambitions. There is evidence from which it reasonably may be inferred that there was no such overall hostility among the rank and file members of Local 906 or even a majority hostility. In fact, Mr. Bladen, who expressed opposition to the expulsion of the Teamsters from the AFL-CIO and who

held the opinion that the Teamsters should be readmitted, was elected president of Local 906 by the rank and file membership and still holds high office in UAW.

The Court has reviewed all of the evidence with detailed and analytical consideration of what it tends to establish. The Court finds that it cannot rely on the testimony of either Mr. Giannone or Mr. Bladen except to the extent that there is convincing corroboration. The corroborating evidence offered was under all of the circumstances, at best, minimal. It was not consistent and in some instances was obviously incredible. In other instances it was refuted by evidence of more convincing and persuasive quality.

On an application of this kind assailing the integrity of a jury verdict on the grounds of alleged prejudice of a juror, the burden of proof rests upon the moving party to establish the charge made by a preponderance of the credible evidence. The jury verdict has presumptive validity and it should not be set aside except upon a showing of essential unfairness of constitutional dimension. D'Arcy v. Handy, 351 U.S. 454, 76 S.Ct. 965, 100 L.Ed. 1331 (1955); Buchalter v. New York, 319 U.S. 427, 63 S.Ct. 1129, 87 L.Ed. 1492 (1943); Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910). In Holt, supra, it was stated, "If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day."

The conclusion reached by this Court after careful analysis of all of the testimony, examination of the exhibits marked in evidence, and reading and consideration of statements made in the affidavits filed, is that the defendant has failed to sustain the burden of proof cast upon him by law. Mr. Cassidy was not acquainted with Mr. Provenzano. There is no logical reason why Mr. Cassidy should bear Mr. Provenzano any personal ill will and no facts have been developed from which this Court can reasonably

infer the existence of any preconceived prejudice in Mr. Cassidy's mind which would impel him to vote for a conviction on any basis other than fair and impartial consideration of the evidence adduced at trial, evaluated in the light of the instructions given by the Court.

Another point is raised. Defendant contends that the juror Cassidy had not been forthright in his answers on the *voir dire* and thereby concealed information which may have caused defense counsel to exercise a peremptory challenge. United States ex rel. DeVita v. McCorkle, 248 F.2d 1 (3rd Cir. 1957), cert. denied 355 U.S. 873; United States ex rel. Fletcher v. Cavell, 287 F.2d 792 (3rd Cir. 1961); Wright v. Bernstein, 23 N.J. 284, 129 A.2d 19 (1956). In each of the cases cited a juror had concealed a material fact which, if known, would certainly have caused defense counsel to exercise a peremptory challenge if the Court failed to excuse for cause. In DeVita, supra, defendant was charged with first degree murder committed during the perpetration of an armed robbery. He was convicted and sentenced to death. One of the jurors had been the recent victim of an armed robbery and failed to disclose this fact as well as the further fact of his acquaintance and association with police officers investigating armed robberies in the vicinity. In the Fletcher case, supra, appellant was charged with murder, convicted and sentenced to life imprisonment. One juror was the son-in-law of a police officer who investigated the commission of the crime and testified as a prosecution witness. Another juror on the same case was a relative of the deceased victim of the murder. Wright v. Bernstein, supra, was a civil action for personal injuries sustained in an automobile accident. The jury returned a verdict of $83,000. Though asked whether any close relative had ever made a claim as the result of an accident, one juror failed to disclose on the *voir dire* that his mother had a claim pending on a suit instituted in the same court and was sitting in the courtroom at the time the *voir dire* was being conducted waiting for her case to be reached for trial by a jury to be drawn from the same panel.

In each of the cases cited there was no dispute about the existence of *the facts* which were not disclosed. Also there was more than mere failure of a juror to disclose a material fact on the *voir dire*. *The facts which were concealed were of such nature that bias could reasonably be inferred,* creating a situation where, in a constitutional sense, it was essentially unfair to permit the juror to serve on the jury. The probability of prejudice was predominant.

Mr. Cassidy was juror No. 5 among the first 12 jurors placed in the box. The *voir dire* was conducted in accordance with Rule 24 of the Federal Rules of Criminal Procedure. The Court conducted the major part of the *voir dire* allowing counsel a limited number of questions to be addressed orally to the jurors, but with no limitation upon subject matter or questions presented to the Court for its further interrogation of the jurors. It might be noted at this point that the Court felt in the interest of fairness to the defendant and Government alike that it would be best to control any detailed factual statements by any juror questioned as to prejudice that he or she might entertain. With this in mind, the Court immediately excused any juror who expressed reservation as to capacity to be impartial without permitting the juror to state the factual basis of his or her prejudice in the presence of the other jurors.

The Court opened the *voir dire* with a detailed statement of the nature of the case with emphasis upon the requirement that only those who could be fair and impartial were qualified to serve. The Court completed its statement of the nature of the case with the following question:

> "Is there any one of you who by reason of the nature of this charge would feel that he or she could not sit as a juror on this case and render a verdict on the evidence without bias, without prejudice, and without

sympathy, and give impartial consideration to that evidence?"

Thereafter, in different form and with repeated emphasis the substance of that question was reiterated. Mr. Cassidy made complete disclosure of the fact that he was a member and officer of Local 906 UAW associated with AFL–CIO. He disclosed that he had been a member since the inception of the union in 1941; that he was a trustee of the union; and that he had held a succession of offices in the union prior to becoming a trustee. He disclosed that the union membership numbered 4500 and he disclosed the names of other officers.

Defendant stresses the fact that Mr. Cassidy did not respond to certain general questions put to the panel where the response was by raising of hands. The reporter noted the jurors who "apparently" raised their hands. At the hearing on this motion it was developed as a matter of record that the reporter's position in the courtroom with his back to the jury was such that during the course of the voir dire he could not be certain as to the accuracy of his observations. There was a general question by the Court to all who did raise hands.

As noted above, there was no restriction upon the number of questions which counsel could submit to be addressed by the Court to the jurors. The record will also show that a morning recess was taken while the jury was being selected and a further recess for lunch before selection was completed. Ample opportunity existed before peremptory challenges were exhausted to develop further detailed interrogation. When all peremptory challenges had been exercised, there was opportunity to submit further questions to excuse for cause and this opportunity still existed after the alternates were chosen and before the jury was sworn.

The main thrust of defendant's argument is grounded upon the contention that negative responses of Mr. Cassidy to some of the questions constituted a failure to disclose his alleged bias against the defendant. Defendant has not established as a fact that such bias existed.

■■ The defendant had a constitutional right to a fair trial by an impartial jury. But this right does not embrace unlimited exercise of peremptory challenges. Defendant exhausted his peremptory challenges; and in every instance where a juror had indicated any reservation on the voir dire as to capacity to consider the evidence without bias or prejudice, the Court excused that juror. If, now, defendant could have a verdict set aside merely on the grounds that if certain information had been revealed on the voir dire, defense counsel might have exercised peremptory challenges in a different manner, then there could never be any finality to litigation involving trial by jury. Protraction would not run apace with means. Besides the Court is not satisfied by any proofs offered that the juror, Cassidy, concealed any material fact on the voir dire.

The most that can be suggested on the basis of the record before this Court is that it would be likely that certain adverse publicity directed toward the defendant would come to the attention of Mr. Cassidy as a member and officer of Local 906 UAW together with other knowledge of the activities of the Teamsters. If there is a likely inference as to this now, it was equally so at the time of the voir dire. Nevertheless, defense counsel, with knowledge of Mr. Cassidy's membership in Local 906 and his position as an officer of that union, did not choose to exercise a peremptory challenge as to him. In considering any negative response on the part of Mr. Cassidy during the voir dire relating to interrogation as to adverse publicity directed to the defendant, it must also be taken into account that news items published in newspapers, by radio and television have different impressive impact upon different individuals resulting in varied degrees of preservation of recollection.

Even if it were assumed for the purpose of argument, contrary to the findings of fact made herein, that Mr. Cassidy had been exposed to literature or

other adverse publicity relating to the defendant which created a biased impression of the defendant in his mind, it would not necessarily follow that such bias would prevail in the determination of the innocence or guilt of the defendant on a specific charge. Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); see also United States v. Thomas Letchos, 316 F.2d 481 (7th Cir. 1963). In the Irvin case it was stated by the Supreme Court at 722 and 723 of 366 U. S. at 1642 and 1643 of 81 S.Ct.:

> "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. Spies v. People of State of Illinois, 123 U.S. 131 [8 S.Ct. 22, 31 L.Ed 80]; Holt v. United States, 218 U.S. 245 [31 S.Ct. 2, 54 L.Ed. 1021]; Reynolds v. United States [98 U.S. 145, 25 L.Ed. 244], supra."

Counsel for the defendant cites Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), for the proposition that a juror exposed to prejudicial statements about a defendant may not be able to remove the bad impressions gained and thereby should be disqualified. In that case the petitioner was charged and convicted of unlawfully dispensing a drug without a prescription from a licensed physician. He did not take the stand to testify. The trial judge refused to permit the Government to show that the petitioner had previously practiced medicine without a license. During the trial two newspapers reported the petitioner's previous record of two felony convictions including an admission of prior practice of medicine without a license. Seven of the jurors saw these newspaper articles while the trial was in progress. The facts in the instant case are not analogous in any respect.

■ Defendant also raises the question of additional evidence that might exist which would be relevant to the issue of guilt and seeks by order of this Court an investigation to be conducted by the Government to develop such evidence. The Court has considered the allegations of defendant's affidavits with reference to the existence of newly discovered evidence and finds that there is no showing that such evidence as is suggested could not have been discovered or was not available at the time of trial. The Court finds no merit to the contention that the Government should conduct the investigation requested.

■ The Government representing the public interest, as well as the defendant, is entitled to fair and impartial administration of justice and every reasonable precaution must be taken in the interest of both to assure that the rights of neither are unduly or unfairly subordinated. But the protection of individual rights cannot be extended to the point where protection of the public interest becomes sterile.

The reasonable balance that must be struck in charting the middle course which gives fair and equal recognition to the competing considerations is not always easy to achieve. General rules developed from experience in the administration of justice by our courts during past decades are helpful guides, but the facts peculiar to each case compel variance in the application.

■ There is one final observation which the Court feels it should make. This Court does not subscribe to the

proposition that a disappointed litigant should be permitted to conduct unrestricted investigation of jurors. The subject matter of this from the standpoint of public policy in the administration of justice is well covered in State v. LaFera, 42 N.J. 97, 106–108, 199 A.2d 630, 635–636 (1964) and this Court subscribes to the views therein expressed which are quoted as follows:

"A jury deliberates in secrecy to encourage each juror to state his thoughts, good and bad, so that they may be talked out. 'Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world.' Clark v. United States, 289 U.S. 1, 13, 53 S.Ct. 465, 469, 77 L.Ed. 993, 999 (1932). Some will recall the furor a few years ago when a jury's deliberations were secretly recorded, notwithstanding that the recording was made in a controlled study and the anonymity of the individual juror was completely assured. Ferguson, 'Legal Research on Trial,' 39 J.Am. Jud. Soc'y 78 (1955).

"For the juror's individual protection, the law raises a privilege against disclosure of his communications during deliberations, a privilege which will yield only to some greater public need. 8 Wigmore, Evidence (McNaughton rev. 1961) § 2346, p. 678; Clark v. United States, supra (289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993). It is true that no settled rule bars extrajudicial, posttrial disclosures by a juror of his own views even though in cases of public interest the trial judge not infrequently cautions against such disclosures. Yet one of twelve may not be able to disclose his own part without revealing something the other jurors are entitled to have protected. Moreover the public too has a stake in the promise of secrecy to insure free debate in cases to come. In these circumstances it is appropriate to protect all the jurors against efforts of others to browse among their thoughts in search of something to invalidate their verdict. This R.R. 1:25A seeks to do. [Referring to State Rule.]

"We see no difference between an intrusion upon a juror personally of which the rule speaks literally and an intrusion into the juror's private relationships with others. If, anything, an investigation conducted among others may be even more disturbing in that it tends to suggest to those who are interviewed that something is already known to be amiss. Hence it is unfair to jurors to permit a disappointed litigant to pick over their private associations in search of something to discredit them and their verdict. And it would be unfair to the public too if jurors should understand that they cannot convict a man of means without risking an inquiry of that kind by paid investigators, with, to boot, the distortions an inquiry of that kind can produce.

"But defendants say that due process of law is denied them if they may not probe to find out whether the verdict was vulnerable. They do not go so far as to say that a proceeding for discovery should lie in which the jurors, their families, friends, and associates may be produced by subpoena, but they do assert a right to search on their own. The State disputes the claim of right and adds with much force that if such a right exists, then every indigent defendant may demand the State furnish him the wherewithal to conduct the far-flung exploration here made.

"It may appear odd to recognize a ground for invalidation of a verdict while denying a litigant a chance to find out whether such an event perchance did occur. The fate of the defendant is thus made to depend upon sheer luck, that the wrongful event somehow comes to light. The

weight of the criticism is appreciated, but when contending values clash in their demands, a balance must be struck, and the balance struck·is not shown to be a poor one because in some unknowable cases there may be an injustice. Overall the instances of invalidating misbehavior are exceedingly few. And even within that limited group, a new trial may be a windfall for the defendant, since if the misconduct is capable of tainting the verdict, the verdict will be set aside without inquiry into the actual impact of that misconduct upon the result. State v. Kociolek, 20 N.J. 92, 100, 118 A.2d 812, 58 A.L.R.2d 545 (1955); State v. Levitt, supra (36 N.J. [266], at p. 271, 176 A.2d 465, 91 A.L.R.2d 1112). Thus there is but a small factor of possible hurt. Against this must be weighed the substantial interest of the public and of defendants as a group, in the full and free debate in the jury room. We think the approach of our rule is correct. In any event we see no constitutional difficulty.

"We do not question the good faith of counsel, for we recognize that prior to our expression in this case another view of the reach of our rule could sincerely be held. In these circumstances we need not consider the State's proposal that the product of an offending investigation be suppressed as a suitable sanction."

A specific rule on this subject has not been adopted by this Court. But the State rule becomes applicable by virtue of General Rule 18 of this Court which provides as follows:

"*Applicability of State Court Procedure.*

"In circumstances not provided for by the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, or these General Rules, the procedure and practice of the courts of the State of New Jersey shall govern."

For the reasons stated, the motion of defendant for a new trial will be denied and the stay of operation of the mandate of the United States Court of Appeals heretofore granted will be vacated.